Sylvester **MARX**, Plaintiff-Appellant,

v.

**CENTRAN CORPORATION, et al.,**
Defendants-Appellees.

No. 83–3602.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 8, 1984.

Decided Nov. 8, 1984.

Rehearing and Rehearing En Banc
Denied Jan. 8, 1985.

---

Eugene Bleiweiss, Donald Weisberger (argued), Lead Counsel, Cleveland, Ohio, for plaintiff-appellant.

John L. Strauch, Robert C. Weber, Jones, Day Reavis & Pogue, Craig Spangenberg (argued), Cleveland, Ohio, John J. Chester, Chester, Hoffman & Willcox, Columbus, Ohio, Victor E. DeMarco, DeMarco & De-Marco, Ron Tonidandel, Spieth, Bell, McCurdy & Newell Co., L.P.A., Cleveland, Ohio, for defendants-appellees.

Before MARTIN, JONES and CONTIE, Circuit Judges.

CONTIE, Circuit Judge.

Plaintiff Sylvester Marx appeals the district court's grant of summary judgment in favor of the defendants. Marx's complaint alleged that the defendants violated numerous federal banking laws and breached their common law fiduciary duties to the shareholders of Centran Corporation. The district court found that some of the statutes upon which Marx relied created no cause of action which he could assert either directly or derivatively for the benefit of the corporate defendants and that the remaining statutes were not violated by the defendants. Since the federal claims lacked merit, the pendent state law claim alleging a breach of fiduciary duty was dismissed under *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## I.

The parties stipulated to the following facts. Defendant Central National Bank of Cleveland (C.N.B.) is a national banking association chartered by the United States. C.N.B. is also a member of the Federal Reserve System. Defendant Centran is a bank holding company as defined in 12 U.S.C. § 1841(a). Centran owns all of the shares of common stock of C.N.B. and, in addition, owns all or substantially all of the stock of several other Ohio banks. Centran is incorporated in the state of Delaware and is qualified to do business in Ohio. Centran stock has been publicly traded since 1972. Marx bought 200 shares of Centran stock in 1978 on the open

market. Centran has approximately 9,000 shareholders and has issued over 4,000,000 shares of common stock. The individual defendants are officers and members of the board of directors of Centran and C.N.B.

This litigation has its origins in an investment scheme undertaken by C.N.B. in 1980. The plan was to obtain leverage by incurring debt during a time of decreasing interest rates and using the assets acquired from the incurred liabilities to buy long-term, fixed-rate governmental obligations. Operating on the assumption that interest rates would fall, C.N.B. believed that the debt required to maintain this portfolio would eventually decrease. That is, the liability would be "rolled over" to progressively lower interest rates. At the same time, the rate of return on the governmental obligations, because it was fixed, would not be affected by the declining interest rates. It was also hoped that the market value of the governmental obligations would rise as interest rates fell.

As events turned out, interest rates did not fall but instead rose and the liabilities were "rolled over" in the wrong direction, increasing C.N.B.'s short-term liabilities. The rate of interest on the short-term liabilities eventually exceeded the rate of return from the investments they were used to maintain, creating a negative carrying cost. At the same time, the market value of the long-term, fixed-rate governmental obligations fell. This resulted in further losses to C.N.B. when it attempted to liquidate some of its investments. The net result was a loss to C.N.B. of over $50,000,000. These losses sustained by C.N.B. decreased the value of its stock and impaired its ability to pay dividends to Centran. As a result, the value of Centran's stock was diminished and Centran's ability to pay dividends was also restricted.

In order to recapitalize, Centran struck a deal with Marine Midland Banks, Incorporated, a New York bank holding company. In 1982, Centran issued 500,000 shares of nonvoting preferred stock. Marine Midland bought the entire issue for a total sale price of $70,000,000. Marine Midland also received a warrant to purchase 2,333,333 shares of common stock at $30 per share. The money Centran generated from the Marine Midland transaction was used to infuse capital into C.N.B.: Centran paid $55,000,000 for a new issue of nonvoting preferred stock of C.N.B.

The short-term liabilities which C.N.B. incurred in order to finance the purchase of the governmental obligations arose as follows. Although the money used to buy the securities was nominally "borrowed," the precise method of obtaining the funds was more complicated than that characterization might suggest. First, C.N.B. obtained "Federal Funds Purchased." Banks which are a part of the Federal Reserve System are required to maintain a minimum deposit overnight in Federal Reserve Banks to clear drafts. Banks which are short of the minimum overnight deposit at the end of a day often "buy" funds from banks which have a surplus. This benefits both banks. The bank which is short in its deposit account obtains the necessary funds through a simple transaction. Because the overnight accounts pay no interest, the "selling" bank obtains a return on its capital which it would otherwise lose. At the opening of business the next day, the "borrowing" bank "sells" back the funds to the "lending" bank and pays a charge for the use of the funds which amounts to interest. The second method of obtaining funds was through the use of Sale and Repurchase Agreements, informally known as Repos. When a bank wants a short-term secured loan, it may sell a security to a lender and at the same time agree to repurchase the security at a later date for a higher price. The lender is secured by owning the security and the bank has the use of the capital generated by the sale. The price differential between the sale and the repurchase amounts to an interest payment.

Marx's claims flow from these events. He claims that the investment scheme and the Marine Midland transaction violated several banking statutes and regulations as well as the directors' common law fiduciary

duties. He also attempted to add a claim that the 1971 transaction in which Centran acquired C.N.B. violated federal securities laws. Marx claims damages by reason of the diminution in value of his shares of Centran caused by the losses suffered by C.N.B. due to its investment portfolio. Marx also claimed that the Marine Midland transaction was a direct result of the losses incurred in the securities investment program and that the Marine Midland transaction has damaged the shareholders of Centran by diluting their control over the corporation, restricting the common stock dividends and subordinating their liquidation rights.

Marx's complaint was structured as follows. Count I asserted a direct action by Marx and a class consisting of all Centran shareholders. Count II presented the identical claims in the form of a derivative action, "in the right of and for the benefit of Centran and its wholly owned subsidiary, Central National Bank." Count III alleged that the individual directors breached their Ohio common law fiduciary duty "to the corporate Defendants" and asserted a state law derivative claim.

## II.

Marx's amended complaint alleged that the defendants violated the following banking statutes and regulations: 12 U.S.C. §§ 24, 82, 84, 375b and 1842(d); 12 C.F.R. § 1.4. We consider these statutes and regulations separately.

### A. 12 U.S.C. § 24

The first question that must be addressed under each of the statutes and regulations relied upon by Marx is whether they provide, either expressly or impliedly, a direct cause of action in favor of shareholders such as Marx. Similarly, under Count II, it must be inquired whether the statutes and regulations provide a cause of action in favor of the corporations which may be asserted derivatively by their shareholders.

■ The district court held that Marx does have a direct and derivative cause of action for alleged violations of 12 U.S.C. § 24. This result is obviously correct. 12 U.S.C. § 93(a) expressly provides that directors of national banks who "knowingly violate" the "provisions of this chapter" of title 12 of the United States Code, "shall be held liable in [their] personal and individual capacity for all damages which *the association, its shareholders, or any other person,* shall have sustained in consequence of such violation."[1] Thus, it is "beyond dispute that under proper circumstances Section 93 creates a direct cause of action by the shareholders against the directors of a national bank." *Harmsen v. Smith,* 542 F.2d 496, 500 (9th Cir.1976) (citing *Chesbrough v. Woodworth,* 244 U.S. 72, 37 S.Ct. 579, 61 L.Ed. 1000 (1917)). *But see Russell v. Continental Illinois National Bank & Trust,* 479 F.2d 131 (7th Cir.), *cert. denied,* 414 U.S. 1040, 94 S.Ct. 541, 38 L.Ed.2d 331 (1973).[2] Since § 24 is within "this chapter," that is, since both § 24 and § 93 are contained in chapter 2 of title 12 of the United States Code, it is clear that Marx may maintain a cause of action both directly and derivatively for the benefit of Centran for violations of § 24.

---

1. This section provides in full:

 If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter, all the rights, privileges, and franchises of the association shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper district or Territorial court of the United States in a suit brought for that purpose by the Comptroller of the Currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation.
 12 U.S.C. § 93(a).

2. It should be noted that *Russell* did not consider the effect of § 93. Rather, it determined that no implied cause of action existed under § 24 without considering whether any statute expressly created a cause of action.

The district court correctly determined, however, that the defendants did not violate § 24. That statute provides, in pertinent part:

> The business of dealing in securities and stock by the [national banking] association shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the association shall not underwrite any issue of securities or stock; *Provided,* That the association *may purchase for its own account investment securities under such limitations and restrictions as the Comptroller of the Currency may by regulation prescribe.*

12 U.S.C. § 24 (seventh) (emphasis added). The statute also provides some specific limitations on a national bank's power to invest in securities. A national bank may not hold investment securities of any single obligor in excess of "10 per centum of its capital stock actually paid in and unimpaired and 10 per centum of its unimpaired surplus fund." *Id.* Section 24 exempts certain governmental obligations from the ten-percent limitation.

> The limitations and restrictions herein contained as to dealing in, underwriting and purchasing for its own account, investment securities *shall not apply to obligations of the United States, or general obligations of any State or any political subdivision thereof* ....

*Id.* (emphasis added). The Comptroller of the Currency has provided regulations implementing these statutory commands. The regulations designate "obligations of the United States, or general obligations of any State or of any political subdivision thereof," referred to in § 24 (seventh), as "Type I securities." *See* 12 C.F.R. § 1.3(c). Obligations which may not be characterized as "obligations of the United States, or general obligations of a State or of a political subdivision thereof" are defined as Type II or Type III securities. *See id.,* § 1.3(d), (e). The regulations restate the statutory command that Type I securities are not subject to the ten-percent limitation but that Type II and III securities are. *See* 12 C.F.R. §§ 1.4, 1.7.

The parties stipulated that the bulk of the investment portfolio in question, "about 75%," consisted of Type I securities. As to the Type II and Type III securities, "[n]o single purchase approached the 10% limit." The stipulation further provided that "the Court may assume no violation of 12 C.F.R. 1.1 et seq. with respect to Type II and Type III Municipal Bonds, and treat the Securities Portfolio increase in Municipal Bond holding as though all purchases with short-term borrowings were purchases of Type I securities."[3]

It is clear from these stipulations that no violation of § 24 (seventh) occurred. Most of the obligations purchased were not subject to the ten-percent limitation and the remaining purchases did not exceed the ten-percent limitation. The district court correctly held that the defendants did not violate 12 U.S.C. § 24 (seventh).

**B. 12 U.S.C. § 82**

12 U.S.C. § 82 is also within chapter 2 of title 12 of the United States Code. Violations of § 82 are therefore within the cause of action created by § 93(a). The district court correctly held that Marx has a direct and a derivative cause of action for violations of this statute.

Marx claimed that the defendants had violated § 82's limitation on the amount of indebtedness a national bank could incur. Marx's complaint was filed on October 8, 1982. After the filing of the complaint and before the district court rendered summary judgment, Congress repealed § 82. *See* Garn-St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, § 402, 96 Stat. 1469, 1510 (Oct. 15, 1982).

---

**3.** The stipulation provided that the term "Municipal Bonds" was intended to include "State, County and Municipality Bonds and Notes." Thus, the stipulation quoted in the text which refers to "Municipal Bonds" included obligations issued by state and county governments, as well as by municipalities.

 The district court correctly noted the general rule that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *See Bradley v. School Board of City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). The district court concluded that the legislative history indicated that the statute should not be applied after its repeal and that no manifest injustice would result from not applying the statute because it was not violated by the defendants. We agree with these conclusions.

Prior to its repeal, § 82 provided that, subject to certain limitations not relevant here, a national bank could not be indebted in an amount "exceeding the amount of its capital stock at such time actually paid in and remaining undiminished by losses or otherwise, plus 50 percent of the amount of its unimpaired surplus fund." *See* 12 U.S.C. § 82 (1976). Marx alleged that the short-term liabilities incurred to finance the investment portfolio exceeded these debt limitations.

The legislative history does not indicate an intention that § 82 should apply after the effective date of its repeal but, to the contrary, reveals that § 82 had become an anachronism and an unnecessary burden upon national banks. In addressing that portion of the legislation which included the repeal of § 82, the Senate Report states:

> Several significant deregulatory provisions are included in the bill to revise or repeal, as appropriate, sections of the national banking laws that are *obsolete and unjustifiably restrictive.* These

amendments ... effect changes that are *long overdue....*

> Most significantly, ... the bill would substantially amend the *arbitrary and inflexible* laws affecting national bank lending and borrowing practices.

*See* S.Rep. No. 536, 97th Cong., 2d Sess. 25, *reprinted in* 1982 U.S.Code Cong. & Ad. News 3054, 3079 (emphasis added).

We also agree with the district court that applying the repeal of § 82 results in no manifest injustice because the statute as it existed before the repeal was not violated by the defendants. The Comptroller's regulations clearly established that the two types of indebtedness involved in this case, Federal Funds Purchased and Repos, were not to be regarded as debts subject to the limitations of § 82. 12 C.F.R. § 7.1130 (1981) stated that purchasing Federal Reserve Funds "does not create on the part of the buyer ... a borrowing subject to 12 U.S.C. § 82, but is to be considered a purchase and sale of such funds." As to the Repos, 12 C.F.R. § 7.1131 (1981) stated that the "purchase or sale of securities by a bank, under an agreement to resell or repurchase at the end of a stated period is not a borrowing subject to 12 U.S.C. 82." Finally, 12 C.F.R. § 7.7518 (1981) made it absolutely clear that "[f]or purposes of 12 U.S.C. § 82, a national bank's indebtedness or liability does not include Federal Funds Purchased ... [or] obligations to repurchase securities sold." [4]

Faced with these clear and unambiguous regulations, Marx can only argue that the Comptroller exceeded his authority in determining that Federal Funds Purchased and Repos are not subject to the limitations of § 82 and that the regulations quoted above are therefore invalid. We do not need to decide whether Marx could succeed with this difficult argument.[5] Section 93(a)

---

**4.** The Comptroller currently treats Repos as borrowings. *See* 12 C.F.R. § 7.7519 (1984). The current regulation is, however, without significance. Since this regulation was promulgated after the repeal of § 82, it clearly was not intended to bring Repos within the limitations of § 82. Rather, it was no doubt intended to make clear that Repos could be borrowings subject to the limitations contained in other provisions of

the federal banking laws, such as 12 U.S.C. § 371c, which restricts dealings between "affiliated" banks.

**5.** "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

provides a cause of action only for *"knowing"* violations of the provisions of chapter 2 of title 12. Manifestly, if the applicable regulations authorized the defendants' actions at the time of their conduct, any violation of § 82 could not have been a knowing one. Even if the regulations were invalid, their existence provides the defendants with a defense to an allegation of a knowing violation of § 82. The district court therefore correctly determined that § 82 should not be applied after its repeal.

## C. 12 U.S.C. § 84

■■■ 12 U.S.C. § 84 is also within chapter 2 of title 12 and Marx can therefore assert a direct and derivative cause of action under § 93(a) for violations of its provisions. Section 84 prohibits a national bank from extending unsecured credit to any single entity in an amount exceeding a percentage of the national bank's unimpaired capital and unimpaired surplus.[6] Marx's amended complaint asserted that C.N.B.'s borrowings "constituted a loan from the national bank to Centran ... in violation of 12 U.S.C. 84." The district court found this construction of the transactions in question to be "inconceivable." We agree.

The paper trail of the transactions is clear. C.N.B. obtained funds by means of Federal Funds Purchased and Repos, used these funds to buy governmental obligations and then held the governmental obligations for itself. Centran never held any of these obligations nor obtained any funds generated by means of Federal Funds Purchased or Repos. The transactions were neither in form nor substance extensions of credit to Centran. Marx has not advanced, nor can we discover, any coherent argument for treating these transactions as loans to Centran.

## D. 12 C.F.R. § 1.4

■ As noted above, most of the securities purchased by C.N.B. were governmental obligations not subject to the limitations contained in 12 U.S.C. § 24(seventh). These "Type I securities" may be invested in by a national bank subject only to the limitation contained in 12 C.F.R. § 1.4, sometimes referred to as the "rule of prudence." Section 1.4 provides in part:

> Type I securities are not subject to the limitations and restrictions contained in 12 U.S.C. 24 .... Consequently, a bank may deal in, underwrite, purchase, and sell for its own account a security of Type I *subject only to the exercise of prudent banking judgment.*

12 C.F.R. § 1.4 (emphasis added). Marx alleged that the defendants failed to exercise "prudent banking judgment."

12 U.S.C. § 93(a) provides a cause of action only for a violation of the provisions of "this chapter." Since 12 C.F.R. § 1.4 is not a part of chapter 2 of title 12 of the United States Code, Marx clearly has no express cause of action for a violation of that regulation under § 93(a). *See Harmsen v. Smith,* 542 F.2d 496, 501 (9th Cir. 1976) (§ 93(a) "does not purport to empower shareholders ... to initiate direct causes of action ... with respect to *any* violation of federal banking law." (emphasis in original)). Marx must, therefore, seek to establish that he has an implied cause of action, either directly or derivatively, arising under some other provision of federal banking laws.

Marx relies on 12 U.S.C. § 93(b) to establish his implied right of action. Section 93(b) is unlike § 93(a) in two important respects. First, while § 93(a) speaks only of violations of "the provisions of this chapter," § 93(b) addresses both violations of the "provisions of this chapter" and "any regulation issued pursuant thereto." Second, while § 93(a) expressly provides for a

---

**6.** The total loans and extensions of credit by a national banking association to a person outstanding at one time and not fully secured ... by collateral having a market value at least equal to the amount of the loan or extension

of credit shall not exceed 15 per centum of the unimpaired capital and unimpaired surplus of the association.

12 U.S.C. § 84(a)(1).

private cause of action for specified violations, § 93(b) is silent on this subject and instead devotes several paragraphs to establishing a procedure whereby the Comptroller of the Currency can assess a civil penalty for the specified violations. 12 C.F.R. § 1.4 is a regulation issued pursuant to chapter 2 of title 12 of the United States Code and is therefore within the general scope of § 93(b). The important question is, however, whether § 93(b)'s creation of certain powers in the Comptroller also creates a private cause of action which Marx may maintain.

We begin our analysis with the premise that the mere "fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *See Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). Rather, the critical question in cases of this type is whether Congress intended to create a cause of action when it enacted the statute in question. *See, e.g., Daily Income Fund, Inc. v. Fox*, — U.S. —, 104 S.Ct. 831, 839, 78 L.Ed.2d 645 (1984) ("our focus must be on the intent of Congress when it enacted the statute in question"); *Jackson Transit Authority v. Amalgamated Transit Union*, 457 U.S. 15, 21, 102 S.Ct. 2202, 2206, 72 L.Ed.2d 639 (1982) ("private right of action decisions address the related question whether Congress intended that a particular party be able to bring suit under a federal statute"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 377, 102 S.Ct. 1825, 1838, 72 L.Ed.2d 182 (1982) ("our focus must be on the intent of Congress"); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 245–246, 62 L.Ed.2d 146 (1979) ("what must ultimately be determined is whether Congress intended to create the private remedy asserted").

As a preliminary matter, we note that the issue arises in a slightly different context than in the usual case. In a typical case in which an implied cause of action is asserted, a plaintiff asserts the cause of action under a federal statute which pro-

hibits, *see, e.g., Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), or requires, *see, e.g., Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), some conduct, or which at least ostensibly protects the rights of a certain class of persons, *see, e.g., Cannon*, 441 U.S. at 689–93, 99 S.Ct. at 1953–56. In this case, the statute in question, 12 U.S.C. § 93(b) contains no substantive provisions. Rather, it merely creates a remedy in favor of the Comptroller of the Currency. The substantive provisions Marx relies on are contained in a regulation, not in a statute. It is fundamental that the Constitution grants the power to Congress, and not to the executive branch, to expand federal jurisdiction or to create a new cause of action. It would be misleading, therefore, to state the issue as whether 12 C.F.R. § 1.4 creates an implied cause of action. It is plain that the Comptroller of the Currency is without authority to do so. The true question is whether Congress, in enacting § 93(b), intended to create a remedy for violations of 12 C.F.R. § 1.4. Accordingly, our analysis focuses primarily on the statute, not on the regulation.

In *Cort*, the Supreme Court identified four factors to be used in discerning congressional intent in cases of this type. The first factor inquires whether the plaintiff is a member of a "class for whose *especial* benefit the statute was enacted." *See* 422 U.S. at 78, 95 S.Ct. at 2088 (emphasis in original). The second factor inquires whether the legislative history either explicitly or implicitly reveals an intent either to create or deny a private cause of action. *Id.* The third factor determines whether holding that a private right of action exists is consistent with the legislative scheme. *Id.* The fourth factor focuses on whether the cause of action is traditionally "relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* The starting point of the analysis is always the language of the statute. *See Jackson Transit*, 457 U.S. at 23, 102 S.Ct. at 2207;

*Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981); *Universities Research Association, Inc. v. Coutu,* 450 U.S. 754, 771, 101 S.Ct. 1451, 1461, 67 L.Ed.2d 662 (1981); *Touche Ross,* 442 U.S. at 568, 99 S.Ct. at 2485.

*First.* Neither the language of 12 U.S.C. § 93 nor of 12 C.F.R. § 1.4 create federal rights for the "especial benefit" of Marx, Centran or C.N.B.;[7] to the contrary, there are affirmative indications in the language of both that no such especial benefit was intended.

Section 93(b) purports only to create a remedy in favor of the Comptroller to enforce the provisions of chapter 2 of title 12 and the regulations issued pursuant to that chapter. Statutes which have been construed to benefit a discrete class of persons by creating a federal right peculiarly in their favor typically have contained direct language suitable to that end. *See, e.g., Cannon,* 441 U.S. at 689–94, 99 S.Ct. at 1953–56 (finding that 20 U.S.C. § 1681(a), which states that "[n]o person ... shall, on the basis of sex, be ... subjected to discrimination under any education program or activity receiving Federal financial assistance," "explicitly confers a benefit on persons discriminated against on the basis of sex"). In contrast to cases such as *Cannon,* 12 U.S.C. § 93(b) contains no such language. Also significant is the presence of an express cause of action in § 93(a), which does not mention violations of regulations, and the absence of such a provision in § 93(b), which does address violations of regulations. This difference between the two subsections leads to the conclusion that "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross,* 442 U.S. at 572, 99 S.Ct. at 2487. *See also Middlesex,* 453 U.S. at 14–15, 101 S.Ct. at 2623–24. Congress has provided a means for enforcement of regulatory requirements such as 12 C.F.R. § 1.4. Indeed,

judging from the mere language of § 93(b), that is the entire purpose of the subsection. "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors,* 444 U.S. at 19, 100 S.Ct. at 247.

12 C.F.R. § 1.4 contains only general prescriptive language requiring national banking associations to exercise "prudent banking judgment." It contains no language which directly confers a benefit upon a specific class of persons. Indeed, the very fact that the regulation in question was promulgated by the Comptroller of the Currency makes it highly unlikely that the class of persons which Marx seeks to represent is to be specially benefited by the regulation. The Comptroller is charged with "the execution of all laws passed by Congress relating to the issue and regulation of a national currency secured by United States bonds ... and of all Federal Reserve Notes." *See* 12 U.S.C. § 1. The Comptroller is not charged with protecting national banks and their shareholders from imprudent directors. The underlying purpose of 12 C.F.R. § 1.4 must necessarily be to assure the stability of the national currency by preventing national banks from engaging in unsound investments in governmental obligations. Given the Comptroller's statutory authority, it would be illogical to construe 12 C.F.R. § 1.4 as operating to the special benefit of the class of persons which Marx seeks to represent directly and derivatively. *Cf. Cort,* 422 U.S. at 80–82, 95 S.Ct. at 2089–90.

Thus, the language of the statute and the regulation indicate that Marx is not representing a class of persons which Congress sought to specially benefit. Moreover, there are positive indications in the language of both that no private cause of action was intended.

*Second.* An examination of the legislative history of 12 U.S.C. § 93(b) reinforces

---

**7.** Since Marx asserts the rights of Centran and C.N.B. derivatively, it is necessary to determine whether a private cause of action was intended for either of those corporations.

the conclusion that no private cause of action was intended.

The manifest intent of Congress in enacting § 93(b) was to provide the "financial institution supervisory agencies with additional powers over depository institutions." *See* H.R.Rep. No. 1383, 95th Cong., 2d Sess. 4, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9273, 9276. Specifically, § 93(b) was added to the National Bank Act to give regulatory agencies more flexibility.

> Regulatory agencies have often contended that their ability to control abuses by insiders and to see that financial institutions are operated in a safe and sound manner are too limited. The hearing records are filled with statements that the agency has the choice of either jawboning—sending letters to officials asking for their cooperation in correcting problems—or using a blunderbuss on the institution. Agency officials have asked for powers which lie somewhere between these two approaches so that they can tailor solutions and responses to specific problems and thus more effectively do their job.

*See id.* at 17, 1978 U.S.Code Cong. & Ad. News at 9289.

■ While this legislative history certainly reveals no intent to create a private cause of action, we cannot say that it affirmatively expresses an intent to deny a cause of action. Where a statute creates a federal right for the special benefit of a class of persons, the absence in the legislative history of an expressed intent to create a cause of action does not indicate that a private cause of action does not exist. *See Cort*, 422 U.S. at 82, 95 S.Ct. at 2089–90. Where, however, the statute does not operate to the special benefit of a certain class, the absence in the legislative history of an expressed intent to create a cause of action will be taken as an affirmative indication that none was, in fact, intended. *See Touche Ross*, 442 U.S. at 571, 99 S.Ct. at 2486. *Cort*, 422 U.S. at 82–84, 95 S.Ct. at

2089–90. As the Supreme Court has stated:

> [W]here, as here, the plain language of the provision weighs against implication of a private remedy, the fact that there is no suggestion whatsoever in the legislative history that § 17(a) may give rise to suits for damages reinforces our decision not to find such a right of action implicit within the section.

*Touche Ross*, 442 U.S. at 571, 99 S.Ct. at 2486.

*Third.* We also conclude that it would be inconsistent with the legislative scheme to infer a cause of action.

The underlying theme of both § 93(b) and 12 C.F.R. § 1.4 is that the Comptroller of the Currency is wisely to exercise a considerable amount of discretion. The regulation establishes a flexible standard of "prudent banking judgment." The statute provides:

> In determining the amount of the penalty the Comptroller shall take into account the appropriateness of the penalty with respect to the size of the financial resources and good faith of the association or person charged, the gravity of the violation, the history of previous violations, and such other matters as justice may require.

12 U.S.C. § 93(b)(2). Similarly, § 93(b)(6) provides that the "Comptroller may, in his *discretion*, compromise, modify, or remit any civil money penalty which is subject to imposition or has been imposed under this section." The Comptroller's final decision is subject to only limited judicial review: the Comptroller's findings are to be upheld if supported by substantial evidence. *See* 12 U.S.C. § 93(b)(4).

Inferring a private cause of action would be inconsistent with this comprehensive scheme. A court, not the Comptroller, would be put in the position of making the initial determination of what is prudent banking judgment. The careful assessment of the factors which the Comptroller considers under § 93(b)(2) would be lost.

A court would not be sitting in review of the Comptroller's decision under the narrow "substantial evidence" standard, but would instead be determining the matter de novo. In short, inferring a cause of action would substantially interfere with Congress' detailed enforcement scheme.

*Fourth.* The soundness of a corporate director's business decisions and the right of a shareholder to recover either directly or derivatively for imprudent business decisions is a matter traditionally relegated to state law. The relationship between federal statutory law and state law governing the duty of a corporate director to the corporation and its shareholders was discussed in *Cort:*

> Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law expressly requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation. If, for example, state law permits corporations to use corporate funds as contributions in state elections ... shareholders are on notice that their funds may be so used and have no recourse under any federal statute. We are necessarily reluctant to imply a federal right to recover funds used in violation of a federal statute where the laws governing the corporation may put a shareholder on notice that there may be no such recovery.

*Cort,* 422 U.S. at 84–85, 95 S.Ct. at 2091.

In conclusion, each of the *Cort* factors leads to the conclusion that Congress did not intend to create a private cause of action for violations of 12 C.F.R. § 1.4 when it enacted § 93(b).[8]

## E. 12 U.S.C. § 375b

12 U.S.C. § 375b generally prohibits national banks from making loans to certain insiders, such as officers of the national bank or individuals or companies owning over a certain percentage of the bank's stock. Marx again asserts that C.N.B.'s investment scheme amounted to a loan from C.N.B. to Centran. The district court found that Marx had no express or implied cause of action for violations of § 375b. Alternatively, the district court held, as it had under Marx's 12 U.S.C. § 84 claim, that C.N.B. did not, in fact, make any loan to Centran.

The district court's holding that Marx had no cause of action was erroneous. Section 375b is contained in chapter 3 of title 12, as a part of the Federal Reserve Act. Section 93(a), which provides a cause of action only for violations of chapter 2 of title 12, does not provide a cause of action for violations of § 375b. A cause of action for such violations is, however, provided by 12 U.S.C. § 503. That statute states:

> If the directors or officers of any member bank shall knowingly violate or permit any of the agents, officers, or directors of any member bank to violate any of the provisions of sections 375, 375a, *375b,* and 376 of this title or regulations of the board made under authority thereof ... every director and officer participating in or assenting to such violations shall be held liable in his personal and individual capacity for all damages which the member bank, its sharehold-

---

**8.** 12 U.S.C. § 24 (seventh) provides that a national banking association has all incidental powers necessary to its business, "subject to law." Marx argues that the requirement that a national bank exercise its incidental powers "subject to law" incorporates the rule of prudence contained in 12 C.F.R. § 1.4 into 12 U.S.C. § 24 (seventh). He thus argues that a violation of 12 C.F.R. § 1.4 is also a violation of 12 U.S.C. § 24 (seventh) and is therefore within the express cause of action created by 12 U.S.C. § 93(a). We reject this argument.

We have already concluded that Congress intended that violations of the rule of prudence were to be acted upon only by the Comptroller of the Currency. The mere existence of the phrase "subject to law" within 12 U.S.C. § 24 (seventh) is too slender a basis for overriding this clearly expressed legislative intent. Moreover, it is not at all clear that the word

ers, or any other persons shall have sustained in consequence of such violation. 12 U.S.C. § 503 (emphasis added).[9]

The district court's error, however, was not attributable to a misreading of the statute, but rather to an error in codification. At one time, the codified version of § 503 contained no reference to § 375b. *See* 12 U.S.C. § 503 (1976); *Lode v. Leonardo*, 557 F.Supp. 675, 677 (N.D.Ill.1982) ("section 375b ... is not included among the sections listed in the United States Code at 12 U.S.C. § 503"). We need not detail the reason for the compiler's error.[10] It suffices to say that § 375b is now listed in the United States Code as one of those sections for which an express cause of action is provided.[11]

■■■ We affirm the district court's conclusion, however, that there was no violation of § 375b. As explained earlier in our discussion of 12 U.S.C. § 84, it is "inconceivable" that the transaction in question amounted to a loan from C.N.B. to Centran.

"law" as it appears in § 24 (seventh) was meant to refer to regulations as well as statutory "law."

9. C.N.B. is a member of the Federal Reserve System and is thus a "member bank" within the meaning of 12 U.S.C. § 503. *See* 12 U.S.C. § 221.

10. The source of the error was explained in *Lode:*

An examination of 12 U.S.C. § 503 reveals that it expressly grants a private remedy for violations of sections 375, 375a, and 376. But section 375b, added to section 22 of the Federal Reserve Act in 1978 ... is not included among the sections listed in the United States Code at 12 U.S.C. § 503. The plaintiffs seek to overcome this difficulty by pointing out that the original version of 12 U.S.C. § 503, which appears in the Statutes at Large as subsection (f) of section 22 of the Federal Reserve Act, does not enumerate the particular provisions of the Federal Reserve Act to which it applies. Instead, the original version uses the general term "this section," referring to all of the provisions of section 22 of the Federal Reserve Act, to designate the provisions within its scope. Thus, since 12 U.S.C. § 375b was made a part of section 22 of the Federal Reserve Act when it was added in 1978, the plaintiffs argue that section 375b is within the scope of section 503 even though not enumerated in the codified version of that statute.

### F. 12 U.S.C. § 1842(d)

■■■ Marx alleges that the transaction in which Marine Midland acquired stock and stock warrants of Centran violated 12 U.S.C. § 1842(d). He asserts a cause of action under 12 U.S.C. § 1847. The district court ruled that Marx had no cause of action and, in the alternative, that even if Marx did have a cause of action, § 1842(d) was not violated. We affirm the conclusion that Marx lacked a cause of action and do not reach the question of whether § 1842(d) was violated.

12 U.S.C. § 1842(d) provides in general that the Federal Reserve Board may not approve a bank holding company's application to acquire a subsidiary bank if the holding company will thereby acquire "directly or indirectly" any "interest" in a bank outside the state in which the operations of the holding company's banking subsidiaries are conducted, unless the state of the bank being acquired consents to such an acquisition.

It appears that the plaintiffs are correct on this point. The Statutes at Large control when a version of a law appearing in the United States Code is inconsistent with that in the original statutes.... A fair reading of the original version of 12 U.S.C. § 503, as it appears in the Statutes at Large, leads to the conclusion that the private remedy it provides is applicable to all provisions of section 22 of the Federal Reserve Act, including the provision added in 1978 which is now codified at 12 U.S.C. § 375b.

*Lode,* 557 F.Supp. at 677 (citations omitted).

11. Because of the compiler's error, the district court focused its analysis on whether an implied cause of action could be inferred from § 503 and § 504. It held that these two sections relate to § 375b in substantially the same manner that §§ 93(a) and (b) relate to 12 C.F.R. § 1.4. That is, it held that the absence of any express cause of action in § 503, under the version of the statute that the district court was relying on, and the express remedy created in favor of the Comptroller of the Currency under § 504 precluded any inference of an implied cause of action for violations of § 375b. Since we find an express cause of action under § 503, we need not address the validity of the district court's ruling that no cause of action could be inferred under § 504.

Marx has not identified any provision granting him an express cause of action for acquisitions undertaken in violation of § 1842(d). Rather, he relies on 12 U.S.C. § 1847 to establish an implied cause of action. Much of the preceding discussion of 12 U.S.C. § 93 applies with equal force to 12 U.S.C. § 1847. Subsection (a) provides for criminal penalties for violations of the statutes contained in chapter 17 of title 12 and the regulations issued thereunder. Subsection (b) provides for a civil penalty for violations of the same laws and regulations and establishes a procedure for the Board of Governors of the Federal Reserve System to assess these penalties. In a manner similar to § 93(b), § 1847(b) provides for discretion in assessing the civil penalty. Judicial review of the Board's determination is provided in 12 U.S.C. § 1848 for "[a]ny party aggrieved." The scope of review is limited: "The findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive." *Id.*

The language of § 1842(d) and § 1847 clearly do not create a federal right for the special benefit of Marx's class. Section 1842(d) merely places a limit on the Board's powers to approve acquisitions of subsidiary banks by bank holding companies; § 1847(a) merely provides a criminal penalty for violations of the Bank Holding Company Act and regulations issued pursuant thereto; § 1847(b) merely grants civil enforcement powers to the Board of Governors of the Federal Reserve System. The Supreme Court has made it clear that, there "would be far less reason to infer a private remedy in favor of individual persons" where Congress, rather than drafting the legislation "with an unmistakable focus on the benefited class," instead has framed the statute simply as a general prohibition or a command to a federal agency.

*Coutu,* 450 U.S. at 772, 101 S.Ct. at 1462 (quoting *Cannon,* 441 U.S. at 690–92, 99 S.Ct. at 1954–55). Section 1842(d) is merely a "general prohibition or a command to a federal agency." Section 1847(b) similarly purports only to grant a remedy in favor of a federal agency. Section 1847(a) provides for criminal sanctions for violations of the Bank Holding Company Act. Although the "provision of a criminal penalty does not necessarily *preclude* implication of a private cause of action for damages," *see Cort,* 422 U.S. at 79, 95 S.Ct. at 2088 (emphasis in original), where there is a "bare criminal statute, with absolutely no indication that civil enforcement of any kind was available to anyone," *see id.* at 80, 95 S.Ct. at 2089, a private cause of action will not be inferred.

The legislative history of the Bank Holding Company Act reveals that the Act was intended as a general public welfare statute. The express purpose of the Act was to regulate "the growth of bank holding companies" for the "*public welfare.*" See *S.Rep. No. 1095, 84th Cong., 2d Sess. 1,* reprinted in *1956 U.S.Code Cong. & Ad. News 2482* (emphasis added). Congress was concerned with the "*undue concentration of control of banking activities,*" see id., *not with the well-being of national banks, bank holding companies or their shareholders.*[12]

Section 1847(b) was added in 1978 as a part of the same legislation that contained § 93(b). *See* Financial Institutions Regulatory and Interest Rate Control Act of 1978, Pub.L. No. 95–630, § 103, 92 Stat. 3641, 3643 (amending 12 U.S.C. § 93 by adding subsection (b)); *id.,* § 106, 92 Stat. 3647 (amending 12 U.S.C. § 1847 by adding sub-

---

**12.** The Supreme Court reached a similar conclusion from its reading of the same legislative history.

The Bank Holding Company Act of 1956 was enacted to accomplish two primary objectives. First, it was designed to prevent the concentration of banking resources in the hands of a few financial giants. Second, it was intended to implement a congressional policy against control of banking and nonbanking enterprises by a single business entity.... *Underlying both objectives was a desire to prevent anticompetitive tendencies* in national credit markets.

*Lewis v. B.T. Investment Managers, Inc.,* 447 U.S. 27, 46, 100 S.Ct. 2009, 2020, 64 L.Ed.2d 702 (1980) (citations omitted, emphasis added).

section (b)). The legislative history noted above for § 93(b) is thus equally applicable to § 1847(b). *See, e.g.,* H.R.Rep. No. 1383, 95th Cong., 2d Sess. 17, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9273, 9289. Section 1847(b) was intended to add flexibility to the Board's enforcement powers, not to create a federal right in favor of national banking associations and their shareholders.

While monopolistic tendencies were Congress' primary concern in enacting the Act, we cannot find any conclusive expression of legislative intent to deny a private cause of action. Since, however, the language of the statutes indicates that no private cause of action was intended, the absence of any expressed intent to create a remedy "reinforces" the conclusion that none was intended. *See Touche Ross,* 442 U.S. at 571, 99 S.Ct. at 2487.

Inferring a private cause of action would also be disruptive of the legislative scheme considered as a whole. The similarities between the civil enforcement scheme established in 12 U.S.C. § 93(b) and in § 1847(b) make our analysis of the former statute relevant here. Because of the degree of discretion granted to the Board and the limited judicial review, we conclude that inferring a cause of action would be inconsistent with, indeed disruptive of, the legislative scheme. This is particularly true when it is considered that "any person aggrieved" by a decision of the Board may seek judicial review under 12 U.S.C. § 1848. *Cf. Middlesex,* 453 U.S. at 13–15, 101 S.Ct. at 2622–23.

Finally, although regulation of bank holding companies is not an area traditionally relegated to the states, this factor alone does not compel a conclusion that a private cause of action was intended. Although the Court in *Cort* listed four factors to be considered in cases of this type, "the Court did not decide that each of these factors is entitled to equal weight." *See Touche Ross,* 442 U.S. at 575, 99 S.Ct. at 2489. Where the first three *Cort* factors indicate that no cause of action was intended, the mere fact that this legislation is in

an area not traditionally relegated to state law cannot change that result.

Finally, we note decisions consistent with this result. *See State of South Dakota v. National Bank of South Dakota,* 335 F.2d 444 (8th Cir.1964), *cert. denied,* 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965); *Quaker City National Bank v. Hartley,* 533 F.Supp. 126 (S.D.Ohio 1981).

### III.

In the parties' stipulations of fact, Marx informed the district court that he intended to add claims that the defendants had violated 12 U.S.C. § 371c. In Marx's response to the defendants' motion for summary judgment, he alleged for the first time that the 1971 transaction in which C.N.B. became a subsidiary of Centran violated 15 U.S.C. §§ 77q and 78j. Marx alleged that the defendants failed to disclose the absence of any preemptive rights in Centran stock to C.N.B. shareholders.

The district court treated these assertions as motions to amend Marx's complaint. Since Marx had already taken advantage of the opportunity afforded to all litigants to amend their complaint once as of right, *see* Fed.R.Civ.P. 15(a), these further amendments could be obtained only by leave of the court or upon the consent of the defendants, *see id.* Rule 15 states, however, that leave to amend "shall be freely given when justice requires." The district court correctly noted that in *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court held that leave to amend should normally be granted unless there is some "apparent or declared reason" to not allow the amendment. *See id.* at 182, 83 S.Ct. at 230. One "apparent" reason for not allowing an amendment is "futility of amendment." *Id.* The district court held that allowing Marx to amend his complaint to add these claims would be futile because they lacked any substantial merit. In reviewing a district court's denial of a motion to amend a complaint, the reviewing court operates under an abuse of discretion standard. *Id.* We find no abuse of discretion in this case.

12 U.S.C. § 371c restricts a bank which is a member of the Federal Reserve System from engaging in certain "covered transactions." These transactions include extending credit to an "affiliate." *See* 12 U.S.C. § 371c(b)(7)(A). An "affiliate" includes a holding company. *See id.,* (b)(1)(A). The thrust of Marx's argument here is that C.N.B.'s borrowings and investments amounted to a loan to Centran. The district court correctly held that allowing this amendment would be futile because there was, in fact, no such loan.[13]

 The district court held that an amendment to add claims of violations of 15 U.S.C. §§ 77q and 78j would be futile because the statute of limitations on those claims had run. This circuit has repeatedly applied Ohio's four-year general statute of limitations for fraud actions to suits of this type. *See, e.g., Nickels v. Koehler Management Corp.,* 541 F.2d 611 (6th Cir.1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). Although state law provides the statute of limitations, the date on which the statute begins to run is a matter of federal law. *Herm v. Stafford,* 663 F.2d 669, 682 (6th Cir.1981). The period of limitations commences when the "fraud is or should have been discovered." *Id.* (quoting *Vanderboom v. Sexton,* 422

F.2d 1233, 1240 (8th Cir.), *cert. denied,* 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970)). An investor is charged with being "at least a person of ordinary intelligence," with exercising "reasonable care," and with a "duty to use diligence in discovering the existence of a cause of action." *Herm,* 663 F.2d at 682.

The alleged nondisclosure in this case dates back to February of 1971. In February of 1972, Centran issued a prospectus which stated that "[t]here are no ... preemptive rights with respect to Centran's Common Stock." Additionally, Marx bought his shares of Centran stock in February of 1978, well over four years before the complaint was filed in this case. Under these circumstances, we hold that the exercise of reasonable care and diligence by an investor of ordinary intelligence would have led to the discovery that Centran stock carried no preemptive rights not later than the time of the investor's purchase of that stock. The district court correctly determined that Marx's proposed securities law claims would be time-barred.[14]

The district court therefore correctly denied Marx's motion to amend his complaint to add these claims.

**13.** The district court held in the alternative that Marx had no cause of action for violations of 12 U.S.C. § 371c. The district court adopted the analysis it had earlier used under 12 U.S.C. § 504 when it had considered Marx's claim under 12 U.S.C. § 375b. *See supra* note 11. The district court apparently overlooked, however, 12 U.S.C. § 501a which provides an express cause of action. That section provides, in part:

Should any national banking association within the United States now organized fail within one year after December 23, 1913, to become a member bank [of the Federal Reserve System] *or fail to comply with any of the provisions of this chapter applicable thereto,* all of the rights, privileges, and franchises of such association granted to it under the National Bank Act, or under the provisions of this chapter, shall be thereby forfeited.... In cases of such noncompliance or violation, other than the failure to become a member bank under the provisions of this chapter, *every director who participated in or assented to the same shall be held liable in his personal or individual capacity for all damages which said*

bank, its shareholders, or any other person shall have sustained in consequence of such violation.

*See* 12 U.S.C. § 501a (emphasis added).

Since we hold that the district court was correct in not allowing the amendment to add a claimed violation of § 371c because Marx had no substantial claim on the merits and because 12 U.S.C. § 501a expressly provides a private cause of action for violations of § 371c, we need not address the propriety of the district court's holding that Marx had no implied cause of action under § 504.

**14.** Marx also appears to argue that by not disclosing the absence of preemptive rights Centran created preemptive rights in its common stock. Marx thus argues that the Marine Midland transaction deprived Centran shareholders of vested preemptive rights. This presents, however, only a pendent state law claim. The district court acted within its discretion in dismissing this pendent claim after finding that the federal claims lacked merit. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

**1552**

### IV.

Marx raises several other arguments against the district court's dismissal of the entire action. These may be disposed of briefly.

■ First, Marx argues that the district court was required to determine whether his complaint could properly be maintained as a class action before it could rule on the merits of the case. To establish this proposition, Marx relies on cases such as *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974), and *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1201 (6th Cir.1974). These cases do not support Marx's position. They merely stand for the proposition that when a district court is determining whether a class action may properly be maintained under Federal Rule of Civil Procedure 23, the relative merits of the underlying dispute are to have no impact upon the determination of the propriety of the class action. These cases do not establish a broad rule that in all cases the determination of the propriety of a class action must precede any consideration of the merits. It has never been doubted that a complaint asserting a class action could be dismissed on the merits before determining whether the suit could be maintained as a class action. *See, e.g., Jacobs v. Gromatsky*, 494 F.2d 513, 514 (5th Cir.), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 107 (1974). *Miller v. Mackey International, Inc.*, 452 F.2d 424, 428–29 (5th Cir.1971). To require notice to be sent to all potential plaintiffs in a class action when the underlying claim is without merit is to promote inefficiency for its own sake. In short, the class action allegations in Marx's complaint presented no impediment to the district court's grant of summary judgment.

■ Second, Marx argues that the district court could not properly dismiss Count II because the stipulation of facts filed by the parties were expressly limited to the claims under Count I. Marx has not identified, however, any new facts or theories he would develop under Count II. Moreover, the only difference between Count II and Count I is that the former is brought as a derivative action and the latter is brought as a direct action; the underlying claims and legal theories are identical as to each Count. Whether Marx has a cause of action for violations of 12 C.F.R. § 1.4 and 12 U.S.C. § 1842(d) is purely a legal question, not dependent upon any factual findings. The preceding analysis reveals that Marx had neither a direct nor derivative implied cause of action for such violations. Similarly, no additional stipulations could change the fact that 12 U.S.C. § 82 has been repealed and that Marx's claim predicated upon a violation of that section must fail, whether brought directly or derivatively. Marx's claims under 12 U.S.C. §§ 84, 375b, and 371c are all predicated upon C.N.B. having made a loan to Centran. The entire transaction which Marx claims gave rise to this loan has been stipulated to and Marx has not identified what new facts he might attempt to assert, whether by affidavit or otherwise, which would lead to a finding that C.N.B. had made such a loan. Finally, Marx's claim under 12 U.S.C. § 24 was predicated on C.N.B. having invested in certain types of securities which, under Count I, Marx stipulated that they had not invested in. Again, Marx has not identified what new facts he would attempt to prove to change the result of his claim under § 24. Had Marx identified further factual issues germain to this action our result might be different. But in the current posture of the case, we conclude that the district court correctly granted summary judgment as to Count II.

■ Finally, Marx argues that the district court erred in dismissing Count III. The court dismissed this count, which raised pendent state law claims, under the discretionary powers recognized in district courts by *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *Gibbs* held that "if the federal claims are dismissed before trial ... the [pendent] state claims should be dismissed as well." *Id.* at 726, 86 S.Ct. at 1139. This is precisely what happened in this case and the district court was operating well within

its discretion when it dismissed the pendent state law claims.

**V.**

For the reasons stated above, the judgment of the district court is AFFIRMED.