Brenda ALLEN, Jeriesha Jones and
Benjamin Roulhac, Plaintiffs,

v.

ARONSON FURNITURE COMPANY,
Defendant.

No. 96 C 7051.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 12, 1997.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Louise T. Walsh, Edelman & Combs, Chicago, IL, for Plaintiffs.

Edward C. Fitzpatrick, Albert Edwin Fowerbaugh, Jr., Lord, Bissell & Brook, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

Plaintiffs Brenda Allen, Jereisha Jones, and Benjamin Roulhac have filed a two-count complaint against Aronson Furniture Company, asserting a federal claim under the Truth In Lending Act, 15 U.S.C. § 1601 et seq. ("TILA"), and state claims under the Illinois Retail Installment Sales Act, 815 ILCS 405/1 et seq. ("RISA"), and the Illinois Consumer Fraud Act, 815 ILCS 505/1 et seq. ("CFA"). The plaintiffs have filed a motion for class certification with Jones representing proposed Class A on the TILA count and the other plaintiffs representing proposed Class B on the RISA/CFA count. Additionally, the plaintiffs have moved for partial summary judgment and Aronson has filed a cross-motion for summary judgment. For the reasons set forth below, Aronson's motion for summary judgment is granted, the plaintiffs' motion for partial summary judgment is denied, and the plaintiffs' motion for class certification is denied as moot.

### I. Background

Aronson Furniture Company is engaged in the retail sale of furniture and appliances, operating 10 stores in the Chicago area. *See* Def.'s 12(M) ¶ 1. Aronson serves many low-income consumers who wish to purchase goods from Aronson on credit extended by Aronson itself. *See id.* ¶ 16. When a customer enters one of Aronson's stores and expresses a desire to purchase goods on credit, the company's sales representatives follow a well-settled procedure. First, the sales representative runs an abbreviated credit check on the would-be customer free of charge. *See* Pl.'s 12(N) ¶¶ 31, 42–47. This credit check serves a preliminary screening function: people with particularly bad credit are discouraged from filling out an application for credit since it would almost certainly be denied. *See id.* Consumers who survive this preliminary screening move on to stage two, and are asked to fill out a credit application and sign a retail installment sales contract. *See* Def.'s 12(M) ¶ 20. These documents disclose that the consumer will be charged a non-refundable "application fee" of $12.00, and Aronson's sales representatives are instructed to orally inform consumers of this fee as well. *See id.* ¶¶ 20–23. The fee is listed on the forms as part of the "amount financed" rather than as a "finance charge." *See id.* Ex. 2. Aronson representatives also request that all prospective customers make a downpayment at this time, but they do not insist on it and some significant number of customers decline to do so. *See id.* ¶¶ 29–30; Pl.'s 12(N) ¶ 29. At stage three, the sales representative sends the completed forms to Aronson's corporate headquarters, where the final decision on whether to extend credit is made. *See* Def.'s 12(M) ¶ 31; Pl.'s 12(N) ¶ 31.

Aronson's ability to collect the $12 application fee charged to prospective customers is affected by two variables: (1) whether the customer's credit application was accepted, and (2) whether the customer made a downpayment. These variables can be viewed as resulting in four classes of customers:

(1) Customers who made a downpayment and their application for credit was approved. For this group, Aronson collects its application fee immediately from the downpayment.

(2) Customers who made a downpayment but their application for credit was denied. For this group, Aronson collects its application fee by deducting $12 when it returns the downpayment to the customer. *See* Def.'s 12(M) ¶¶ 33–36 (noting that Aronson collected $110,639 in this fashion between January 1994 and December 1996).

(3) Customers who made no downpayment but are approved for credit. For this group, Aronson collects its $12 once the customer begins making installment payments.

(4) Customers who made no downpayment and are denied credit. For this group,

Aronson is not always able to collect its $12 fee, and it makes no serious effort to do so. *See* Pl.'s 12(N) ¶ 37.

The plaintiffs contend that Aronson's characterization of its $12 application fee as part of the "amount financed" rather than as a "finance charge," when combined with its failure to collect the $12 from people in group four, places the company in violation of TILA, RISA, and CFA. *See* Pl.'s Resp. Br. at 7. We examine this contention below.

## II. Summary Judgment Standard

"A district court must grant summary judgment where the record before it shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir.1995) (quoting FED.R.CIV.P. 56(c)). The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If this burden is carried, the non-movant "must set forth specific facts showing that there is a genuine issue for trial" in order to defeat summary judgment, and cannot merely rest on the allegations contained in the pleadings. FED.R.CIV.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

■ In this case, the parties have filed cross-motions for summary judgment. Although the parties dispute the legal significance of certain facts, there are no material factual disputes that we can discern. This case therefore appears ripe for judgment on the paper record. One procedural question must be resolved, however: given that the plaintiffs have moved for certification of a class, should we rule on that motion first, or proceed directly to the merits? Ordinarily, the Federal Rules require courts to rule on class motions "as soon as practicable," that is, before deciding any of the merits questions. *See* FED.R.CIV.P. 23(c). But the Sev-

enth Circuit, among others, has held that despite this directive, in certain cases it might be appropriate to rule on a summary judgment motion prior to ruling on the class motion. *See Cowen v. Bank United*, 70 F.3d 937, 941 (7th Cir.1995) (Rule 23(c) "requires certification as soon as practicable, which will usually be before the case is ripe for summary judgment. But 'usually' is not 'always,' and 'practicable' allows for wiggle room.") *Floyd v. Bowen*, 833 F.2d 529, 534 (5th Cir. 1987); *Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir.1984); *see also* 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE, § 1785 at 127 (2d ed. 1986) ("In appropriate cases the court may use an accelerated summary judgment procedure prior to class certification to test plaintiffs' right to proceed to trial.") The only guidance these sources provide regarding when this approach might be appropriate is that if the plaintiffs' claims are without merit, summary judgment may properly precede a ruling on the motion for class certification: as the Sixth Circuit observed, "[t]o require notice to be sent to all potential plaintiffs in a class action when the underlying claim is without merit is to promote inefficiency for its own sake." *Marx*, 747 F.2d at 1552. As explained below, we believe the plaintiffs claims are without merit, and we therefore choose to issue a ruling on the merits before considering the motion for class certification.[1]

## III. Discussion

■ The plaintiffs' claims under RISA and CFA are predicated on violations of TILA. This is necessarily so: compliance with TILA establishes compliance with RISA and CFA. *See* 815 ILCS 405/5 ("A retail installment contract which complies with the federal Truth in Lending Act ... and any regulations issued ... thereunder, shall be deemed to be in compliance with the provisions of [RISA]."); *Lanier v. Associates Fin., Inc.*, 114 Ill.2d 1, 101 Ill.Dec. 852, 859, 499 N.E.2d 440, 447 (1986) ("[A] defendant's compliance with the disclosure requirements of the

---

1. Because the analysis in this opinion focuses exclusively on Aronson's motion for summary judgment, our citations to briefs and to 12(M) or 12(N) statements are only to those submitted pursuant to that motion (as opposed to materials submitted pursuant to the plaintiff's partial motion for summary judgment).

Truth in Lending Act is a defense to liability under the Illinois Consumer Fraud Act....""). Thus, if Aronson can establish that it has complied with TILA, it is entitled to summary judgment on all of the plaintiffs' claims.

 TILA imposes strict requirements on lenders regarding the disclosure of their terms of credit.[2] In particular, lenders must disclose their finance charges to consumers, along with an explanation of how the charges were calculated. *See* 15 U.S.C. § 1638(a); 12 C.F.R. § 226.6(a). The term "finance charge" is defined as "the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4(a); *see also* 15 U.S.C. § 1605(a). Because a fee charged for a creditor's investigation of a potential customer's credit-worthiness is clearly "incident to" the extension of credit, application fees such as those charged by Aronson normally are considered finance charges and must be disclosed as such. Thus, at first glance, Aronson appears to have violated TILA by characterizing its application fee as part of the "amount financed" rather than as a finance charge. *Cf. Rodash v. AIB Mortgage Co.*, 16 F.3d 1142, 1147–48 (11th Cir.1994) (creditor is liable under TILA for mischaracterizing a finance charge as part of the amount financed).

 Certain charges that would otherwise meet the definition of "finance charge" are specifically excluded, however. The regulations indicate that a charge is not a finance charge if it is an "[a]pplication fee[] charged to all applicants for credit, whether or not credit is actually extended." 12 C.F.R. § 226.4(c)(1). Aronson suggests that its application fee qualifies for this safe harbor because it does in fact charge $12 to all applicants for credit. The undisputed facts appear to support this assertion. Aronson's sales contracts, purchase orders, and down-

payment receipts all conspicuously indicate that the applicant is being charged a non-refundable credit application fee of $12, and Aronson's sales representatives orally inform customers of this fee as well. *See* Def.'s 12(M) ¶¶ 21, 23, 26, 30; *see also id.* Exs. 2–5. These communications do not indicate that the fee is contingent upon a favorable disposition of the customer's credit application.

The plaintiffs present two rationales for denying Aronson the protection of the § 226.4(c)(1) safe harbor. First, the plaintiffs observe that Aronson does not charge the $12 fee to those persons eliminated by its preliminary screening process, and thus the fee cannot be said to apply to "all applicants for credit." *See* Pl.'s Resp. Br. at 6. This argument overlooks the significance of the word "applicants." As explained in the *Background* section *supra*, the purpose of Aronson's preliminary screening process is to identify those customers with particularly bad credit ratings and to discourage them from submitting pointless applications—by definition, these people are not yet "applicants for credit." Hence, the fact that Aronson does not charge these people a $12 application fee has no bearing on its ability to claim the protection of § 226.4(c)(1).

Second, the plaintiffs claim that § 226.4(c)(1) is inapplicable because a number of Aronson's prospective customers—namely, those we classified as group four in our *Background* section—never actually pay the $12 application fee. *See* Pl.'s Resp. Br. at 7. The plaintiffs repeatedly observe that Aronson is unable to "collect" its $12 fee from persons who are denied credit and who did not make a downpayment when they applied for credit. *See id.;* Pl.'s 12(N) ¶ 18. But in order to qualify for the protection of § 226.4(c)(1), Aronson need only prove that its application fee was "*charged* to all applicants for credit," not that the fee was actually *collected* from all of them. The two concepts are distinguishable, and we do not believe that the former encompasses the latter. Even the

---

**2.** TILA only applies to persons extending credit where four conditions are met: "(i) the credit is offered or extended to consumers; (ii) the offering or extension of credit is done regularly; (iii) the credit is subject to a finance charge .... and

(iv) the credit is primarily for personal, family, or household purposes." 12 C.F.R. § 226.1(c)(1). Aronson does not dispute that the credit it extends meets these conditions.

plaintiffs concede that the ordinary meaning of the word "charge" is "'to ask payment (for): as, we *charge* for this service.'" Pl.'s Resp. Br. at 8 (quoting WEBSTER'S UNABRIDGED DICTIONARY).[3] Aronson asked for a payment of $12 from every person who filled out an application for credit, and therefore "charged" them $12 in the plain sense of the word. The fact that a small percentage[4] of applicants ultimately did not pay the fee is immaterial.

The plaintiffs contend that, in certain cases, our interpretation of the term "charge" might encourage creditors to impose "sham" application fees: a creditor could "circumvent TILA by simply including a charge on the retail installment contract for all applicants but only collecting from those who actually received or were extended credit." Pl.'s Br. at 8. If a consumer could show that a creditor collected its application fee only from those customers to whom credit was extended, perhaps the fee could not be said to have been "charged" in good faith to all applicants—we should not elevate form over substance, even in the formalistic universe of TILA. But these are not the facts of our case. Aronson indisputably collected its application fee from many applicants who were denied credit. Between January 1994 and January 1997 the company collected $110,639 from consumers who were denied credit but made a downpayment—those identified as group two in our *Background* section—which means that roughly 9,218 individual consumers who were denied credit nevertheless paid the application fee. *See* Def.'s 12(M) ¶ 36. Aronson's application fee was not a sham.

In sum, Aronson's application fee was charged to all applicants, and therefore was not a finance charge. It follows that Aronson did not violate TILA by characterizing the $12 fee as part of the "amount financed" on its disclosure forms. And since the company did not violate TILA, it did not violate RISA or CFA either.

### IV. Conclusion

For the foregoing reasons, Aronson's cross-motion for summary judgment [38–1] is granted and the plaintiffs' motion for partial summary judgment [26–1] is denied. Plaintiffs' motions for class certification [22–1] and to dismiss affirmative defenses [12–1] are denied as moot. It is so ordered.

---

3. TILA and its accompanying regulations contain no definition of "charge," implying that the term should be given its ordinary meaning. We note, however, that the definition of the term "finance charge" appears to support our position. A finance charge "includes any charge *payable* directly or indirectly by the consumer...." 12 C.F.R. § 226.4(a) (emphasis added). Thus, the existence of a charge depends on whether there is an amount *payable,* not on whether that amount is actually *paid.*

4. Approximately 15% of all credit applicants are turned down. *See* Hoyne Dep. at 13. This means that the maximum possible percentage of Aronson credit applicants who might not have paid the $12 fee is 15%, since we know that any customer whose credit was approved (i.e. any customer in groups one and three, as defined in our *Background* section) necessarily paid the fee. We know, however, that the actual percentage of customers who did not pay the fee is something less than 15%, and probably considerably less, because a substantial number of customers who were denied credit nevertheless paid the fee (i.e. customers in group two).