**Lisa A. TRULL, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**LASON SYSTEMS, INC., Defendant.**

**No. 97 C 855.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 4, 1997.

Brian K. Hodes, Chicago, IL, Christopher V. Langone, Langone & Hodes, Chicago, IL, for Plaintiff

Roger J. Guerin, Alan S. Madans, John G. Dalton, Rothschild, Barry & Myers, P.C., Chicago, IL, Laurence B. Deitch, Joel H. Serlin, Seyburn, Kahn, Ginn, Bess, Deitch and Serlin, Southfield, MI, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Lisa Trull originally filed this putative class action against two defendants, Lason Systems, Inc. and Arrow Services Bureau, alleging numerous Fair Debt Collection Practices Act ("FDCPA" or "Act") violations. On the heels of Trull's motion for class certification, defendant Lason moved for summary judgment, contending that it cannot be liable under the FDCPA because it is not a "debt collector" covered by the Act. While these motions were pending, defendant Arrow Services was dismissed from the case, leaving Lason as the sole defendant. Consequently, whether this case proceeds further depends on whether Lason meets the FDCPA's definition of "debt collector." Because we answer that question in the negative, we grant the defendant's motion for summary judgment and deny Trull's motion for class certification as moot.

## RELEVANT FACTS [1]

On January 19, 1996, Arrow Services Bureau sent Trull a letter attempting to collect a debt she owed to Retailers National Bank/Marshall Fields ("Fields"). Complt. ¶¶ 2,3. The letter advised Trull that Fields had retained "this office" to collect her outstanding obligation and requested full payment; the letter also disclosed Trull's rights to dispute the debt and demand verification. *Id.* Ex. A. Arrow's name, return address and phone number were printed at the top of the page. *Id.* At the bottom of the letter, Arrow listed a "contact," Marty Pryor. *Id.*

On February 9, 1996, Trull received a second collection letter. *Id.* ¶ 2. It arrived in an envelop embossed with the words "Priority–Gram" and a statement that the letter was "electronically transmitted by Lason Systems for priority postal delivery." *Id.* Ex. B. Inside, the letter's author explained that "I have been authorized" by Fields to present a settlement offer: if Trull paid 50% of her outstanding balance, Fields would consider the debt settled. *Id.* If Trull did not act within 30 days, the offer expired and the full amount would again be due. *Id.* The

---

1. The facts are derived from statements that the parties filed with this Court under the Northern District of Illinois' Local General Rule 12(M)—(N). Rule 12(M)(3) requires a party moving for summary judgment to file "a statement of material facts as to which the moving party contends there is no genuine issue." The movant's statement must contain "specific references to affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth." Rule 12(M)(3). Similarly, Rule 12(N)(3)(b) authorizes the non-moving party to submit a statement of "additional facts that require the denial of summary judgment"; under Rule 12(M), the moving party may then submit a reply to the non-moving party's additional facts. All properly supported material facts set forth in either party's statement are deemed admitted unless properly controverted. *See* Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994); *Stewart v. McGinnis*, 5 F.3d 1031 (7th Cir.1993). Moreover, the mere denial of a particular fact without specific references to the affidavits, parts of the record, and other supporting materials is insufficient, and, where a properly supported factual assertion is met with such a naked denial, the fact may be deemed admitted. *Flaherty*, 31 F.3d at 453.

letter was signed by Marty Pryor, and Arrow's name, address, and telephone number were typed below the signature. *Id.* In the upper right-hand corner appeared the words "Lason Systems Inc. Priority–Gram TM"; printed across from this was an address, which matched Arrow's at the bottom. *Id.* This correspondence was the first Trull had seen bearing Lason's name. *Id.* ¶ 4. Ten days later, Trull got another letter from Arrow, asking for "a check of some kind on this account." *Id.* Ex. C. Marty Pryor again signed the letter, and Arrow's name, address and phone number appeared in the upper right-hand corner. *Id.* Like the January 19 letter, this communication made no reference to Lason.

The letters Trull received do not explain Lason's significance or its relationship to Arrow. The parties' submissions, however, reveal that Lason is an integrated outsourcing services provider that helps companies manage records, control documents, and disseminate business communications. Def's Facts ¶ 5. Most relevant to this suit is Lason's business communications service, which facilitates customers' large scale distribution of statements, reports, and letters to consumers and other target audiences. *Id.* ¶ 9. Although this sector of Lason's business provides customized processing services for collection agencies, Lason's customers span ·a wide range of industries. *Id.* Banks, brokerage firms, finance companies, government agencies, insurance companies, utilities, and educational groups also take advantage of Lason's business communications services, including the "Priority–Gram" product that Arrow used in connection with Trull's February 9 letter. *Id.* ¶¶ 10, 16. Companies purchase these services from Lason through an Agreement for Professional Services. *Id.*

In 1992, Arrow and Lason signed such an Agreement, which provided that Lason would accept electronic transmissions from Arrow daily, produce laser printed collection letters on white stationery with envelopes, and furnish for an additional fee color stock paper and the Priority–Gram product.[2] *Id.;* Def's Mot. S.J. Ex. A. Lason billed Arrow at a flat monthly rate, covering first class postage, forms, and àll data processing. Def. Mot. S.J. Ex. A.

The parties focus intently on Lason's involvement in shaping its collection agency customers' letters, specifically, Arrow's. Lason states that it merely prints and mails letters for its customers, including collection agencies, and denies that it writes, conceives, edits (beyond proofreading) or approves the communications. Def's Facts ¶¶ 11, 14. These form letters, Lason states, are designed and written by its customers, in this case, Arrow. *Id.* ¶¶ 11–14. Brian Cutler, Arrow's Vice President of Operations, described Lason and Arrow's respective roles in the process. He testified that Arrow initially typed approximately 45 form letters and faxed them to Lason. Cutler Dep. at 30. Lason then entered the text into its computer, sent proofs for Arrow's approval, and assigned a code number to each form letter. *Id.* Nesbitt Dep. at 34. Information that Arrow varied from letter to letter was put into "fields" that Lason would update after receiving the information from Arrow via modem. Def's Facts ¶ 12. After receiving Arrow's information, Lason machine-stuffed the letters, affixed postage, and brought them to the post office for delivery. Def.'s Facts ¶ 13. Cutler testified that Lason did not draft any of the collection letters that it printed for Arrow, and denied that Lason advised Arrow about the content or use of its collection letters. Cutler Dep. at 43–44.

Trull, however, disputes this characterization, claiming Lason is intimately involved in developing all of its collection agency customers' form letters. Pl.'s Add'l Facts ¶¶ 37–38. Trull cites to language in a prospectus that Lason's parent company submitted to the Securities Exchange Commission in 1996, which states: "The format and wording of many of the collection letters distributed by the Company, including its Priority–Gram,

---

**2.** Lason's Priority–Gram uses a white and blue envelope printed with the words "Priority–Gram TM" and is printed on white and blue paper. Def.'s Facts ¶ 15. Arrow normally used the Priority–Gram to transmit settlement offers, changing the letter's look from previous correspondence so that the debtor "doesn't throw it out like the other three letters he may have gotten." Cutler Dep. at 35.

are developed by the Company." *Id.* app. B at 42. Trull also emphasizes that Lason goes beyond mailing and printing form letters. For example, Lason offers collection agencies a change of address processing system ("NCOA"), as well as phone and zip code updating systems, to ensure that the collection agencies' mailing and contact information is as accurate as possible. *Id.* ¶ 49.

Trull claims that Lason's promotional materials and other public statements further confirm its involvement in the debt collection process. In particular, Trull highlights materials stating that Lason strives to become a "strategic partner" with its clients. Pl.'s Add'l Facts ¶ 53. Lason also promotes its pre-designed Priority–Gram as a communication intended to provide "high visual impact" so that the customer's "message will be read and acted upon," "adding value" to the customer's business and resulting in increased profits. *Id.* ¶ 44, app. D. Its ads also tout the NCOA as a way to "improve collections results." *Id.* ¶ 49. Finally, Trull points to statements in the parent company's 1996 prospectus acknowledging the possibility of FDCPA liability:

> Certain of the Company's customers ... are subject to various consumer protection laws, including the Fair Debt Collection Practices Act.... From time to time, certain of the Company's customers are subject to claims or are parties to litigation under such laws involving services supplied by the Company to such customers, such as collection letter processing. These actions sometimes relate to the form and content of the collection letters distributed by the Company. *There can be no assurance that the Company will not be determined to be liable under such laws.*

(*Id.* app. B at 9) (emphasis added).

However, the prospectus opines that the company will not be held liable under the Act as a debt collector. *Id.* at 42. It is undisputed that Lason is not licensed or registered as a collection agency and has no ownership interest in any such entity. Def's Facts ¶ 18. Lason receives no money from debtors, does not follow up debt collection letters by calling or further contacting debtors, and maintains no files on the debts its customers are trying

to collect. *Id.* at ¶¶ 18–25. Nor is Lason's payment linked to the success or failure of its collection agency customers' efforts. Def's Facts ¶¶ 27–28. The letters Lason sends do not contain its address or phone number, or instruct the debtor to contact Lason. *Id.* ¶¶ 22–23.

Nevertheless, Trull claims that genuine issues of material fact remain as to whether Lason is a debt collector under the FDCPA. As a debt collector, Trull contends, Lason violated the Act by: including language besides the debt collector's address on the envelope; misrepresenting the urgency of the communication to Trull by calling it a "Priority–Gram"; and failing to include the requisite verification notice in its initial letter to Trull. *See* 15 U.S.C. §§ 1692f(8), 1692e, 1692g. We need not reach these latter issues, however, because we find that Lason is not a debt collector as defined by the Act, compelling summary judgment in Lason's favor.

## LEGAL STANDARDS

### I. Propriety of Deciding Summary Judgement Before Class Certification

But first we must dispose of a threshold issue: may we rule on summary judgment before addressing Trull's motion for class certification? Normally, we should decide class certification "as soon as practicable," *see* Fed.R.Civ.P. 23(c), in other words, before a determination on the merits. *Allen v. Aronson Furniture Co.*, 971 F.Supp. 1259, 1261 (N.D.Ill.1997). In *Allen*, however, the court pointed out that many authorities, including the Seventh Circuit, permit deciding summary judgment first "if the plaintiffs' claims are without merit." *Id.* at 1261 (citing *Cowen v. Bank United*, 70 F.3d 937, 941 (7th Cir.1995); *Floyd v. Bowen*, 833 F.2d 529, 534 (5th Cir.1987); *Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir.1984); 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1785, at 127 (2d ed.1986)). We, too, agree with the Sixth Circuit's observation that "[t]o require notice to be sent to all potential plaintiffs in a class action when the underlying claim is without merit is to promote

inefficiency for its own sake." *Marx,* 747 F.2d at 1552. Because we find below that Trull's claims are without merit, we conclude that deciding summary judgment before class certification is the appropriate procedure in this case. *See Allen,* 971 F.Supp. at 1261 (employing same procedure).

## II. Summary Judgment Standards

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court must view all evidence in a light most favorable to the nonmoving party, and draw all inferences in the nonmovant's favor. *Wolf v. Buss America, Inc.,* 77 F.3d 914, 918 (7th Cir.1996); *Taylor v. Canteen Corp.,* 69 F.3d 773, 779 (7th Cir.1995). However, if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 259–60, 106 S.Ct. at 2515–16; *Unterreiner v. Volkswagen, Inc.,* 8 F.3d 1206, 1212 (7th Cir.1993).

In ascertaining whether a genuine issue exists, the court must "view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby,* 477 U.S. at 254, 106 S.Ct. at 2513. "If the record taken as a whole could not lead a trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." *Matsushita Elec. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to decide whether sufficient evidence exists to support a verdict in the non-movant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14. With these standards in mind, we examine the FDCPA's applicability to Trull's claims.

## III. Legal Standards Applicable to FDCPA Claims

The FDCPA was enacted in 1977 "to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). To this end, the FDCPA prohibits debt collectors from employing certain methods to recoup a debt. *Bass v. Stolper, Koritzinsky, Brewster & Neider S.C.,* 111 F.3d 1322, 1324 (7th Cir.1997). Prohibited methods include threats of violence, use of obscene language, certain contacts with acquaintances of the consumer, late night phone calls, and simulated legal process. *See Jenkins v. Heintz,* 25 F.3d 536, 538 (7th Cir.1994), *aff'd sub nom. Heintz v. Jenkins,* 514 U.S. 291, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995). These prohibitions, however, apply only to those who meet the statutory definition of a "debt collector." *See* 15 U.S.C. §§ 1692e, 1692f, 1692g.

The Act defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect directly or indirectly, debts owed or due or asserted to be owed or due another." *Id.* § 1692a(6). Courts have applied the definition's terms literally, expanding its coverage beyond the traditional debt collection agency. The most recent cases hold, for example, that "debt collector" includes attorneys litigating debt collection cases on behalf of their clients. *See Jenkins v. Heintz,* 25 F.3d 536, 538–39 (7th Cir.1994), *aff'd sub nom. Heintz v. Jenkins,* 514 U.S. 291, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995); *Tolentino v. Friedman,* 46 F.3d 645 (7th Cir.1995). Such litigation, these decisions reason, is, at bottom, an "attempt to collect" a debt, which satisfies the Act's "plain English" definition. *Heintz,* 514 U.S. at 294–95, 115 S.Ct. at 1489–91; *see Tolentino,* 46 F.3d

at 649 ("Nothing in this definition hints that attorneys in the course of litigation should be excluded.").[3]

■■■■■ The Seventh Circuit's decision in *Jenkins v. Heintz*, 25 F.3d 536, 538–39 (7th Cir.1994), is the seminal case holding that a defendant's activities, not its formal status as a collection agency, is dispositive on the "debt collector" issue. In *Jenkins*, the defendant attorney sued a debtor in attempt to collect a debt on behalf of his creditor client. The debtor brought a FDCPA action against the attorney, alleging that the attorney had attempted to collect unauthorized charges beyond the debt amount. In defense, the attorney claimed that the Act applied only to the "seamier" side of debt collection practices, not to reasonable collection methods such as litigation. *Id.* at 538–39. The court, however, held that the label attorneys may attach to their activities (i.e., practicing law vs. collecting debts) is irrelevant. Rather, the question is whether the " 'principal purpose' " of the defendant's work is " 'the collection of debt.' " [4] *Id.* at 539 (quoting *Scott v. Jones*, 964 F.2d 314, 316 (4th Cir.1992)). Turning to the statutory language, the court found it satisfied because the defendant's suit was still just another method of "attempt[ing] to collect a debt." *Id.* at 539. The U.S. Supreme Court affirmed, essentially adopting the Seventh Circuit's analysis. *Heintz*, 514 U.S. at 299, 115 S.Ct. at 1493.[5]

The district court in *Fratto v. Citibank, Jablon, & Capitol Credit Agency* similarly scrutinized the defendant's activities, in the form of its contribution to the offending communication, to see whether it was attempting to collect debts. 1996 WL 554549, *5 (N.D.Ill. Sept.25, 1996). The court held that an issue of fact existed as to whether the defendant creditor, Citibank—as opposed to the collection agency it had hired—was acting as a debt collector by providing the impetus behind collection letters that allegedly violated the Act. *Id.* at *7. While the collection agency had physically mailed the letters, "numerous facts" supported the plaintiff's contention that the collection agency was merely a mailing service for Citibank, the real debt collector. *Id.* The collection agency never discussed with Citibank the collection process or what steps to take with certain debtors, did not maintain files on the debtors, and was not compensated for anything besides mailing the letters. *Id.* at *6–*7. Moreover, the letters listed the name and phone number of a Citibank employee (although it was not designated as such) as a contact. *Id.* at *3.

Finally, in a case very similar to the one before us, the district court in *Powell v. Computer Credit, Inc.*, 975 F.Supp. 1034 (S.D.Ohio 1997), held that the defendant's lack of involvement with the offending communication precluded FDCPA coverage and compelled summary judgment in the defendant's favor. The plaintiff in *Powell* had received a "ComputerGram," which contained the text of a collection letter. The ComputerGram was mailed by the defendant, Computer Credit, Inc., and printed on Computer Credit stationery; however, the return address and phone number "clearly indicat-

---

3. These rulings were further bolstered by Congress' earlier decision to repeal the FDCPA's exemption for attorneys "collecting a debt ... on behalf of and in the name of a client." *Heintz*, 514 U.S. at 294–95, 115 S.Ct. at 1491; *see* 15 U.S.C. § 1692a(6)(F) (repealed 1986).

4. The Seventh Circuit hinted in an earlier case that not only a defendant's business activities but also his advertising may be relevant to whether he meets the debt collector definition. In *Federal Trade Commission v. Shaffner*, 626 F.2d 32 (7th Cir.1980), the defendant attorney was the subject of an FTC investigation into possible FDCPA violations. The court held that, despite the FDCPA's exemption for attorneys (which was still in force), the FTC had full authority to inves-

tigate the defendant attorney. *Id.* at 37. Moreover, the court suggested that the attorney's activities might take him out of the exemption and render him a debt collector: "For instance, appellee *may advertise his business as a debt collection agency* rather than a law practice, and might employ several employees for the purpose of soliciting debt collection business or contacting debtors to secure payment of account; activities which may not fall within the statutory exclusion." *Id.* at 36 (emphasis added).

5. The Supreme Court remanded the case for a determination on whether the attorney violated the Act. The district court answered in the negative, granting summary judgment in favor of the attorney, and the Seventh Circuit upheld this

ed" that the communication was from the creditor, Mercy Medical Center, and the letter's text instructed the debtor to call Mercy Medical with any questions. *Id.* at 1039–41. Although Computer Credit had sent Mercy Medical a sample collection letter, Mercy Medical made "significant changes" to it and ultimately approved the letter. *Id.* at 1040–41. In light of these undisputed facts, the court granted summary judgment, finding that letter was "a communication ... from Mercy Medical," and that Computer Credit, in turn, was "merely a mailing service." *Id.*

█ Drawing on this case law, Trull focuses on three of Lason's activities in support of her claim that Lason is a debt collector: (1) Lason's advertising; (2) Lason's involvement with its collection agency customers' communications; and (3) Lason's appearance on the communication to Trull. Upon examining these areas, we conclude that none, alone or combined, renders Lason a debt collector.

## ANALYSIS

### I. Lason's Advertising and Service Packages Do Not Expose It to FDCPA Liability

Trull begins with the argument that Lason's advertising and services create a genuine issue of fact as to whether Lason is a debt collector. By advertising that its services improve open and read rates for collection mailings, that the services "add value" and increase profits, and by promoting its desire to form a "strategic partnership" with collection agencies, Lason allegedly aids the debt collection process to a degree that warrants coverage under the Act. Essentially, Trull is urging us to infer that Lason attempts to collect debts from the fact that Lason markets itself to collection agencies, among other businesses. Our review of the undisputed evidence, however, discloses that

this is an unreasonable inference that is factually unsupported.

Lason's promotional materials do not advertise its business as debt collection. *Cf. Federal Trade Commission v. Shaffner,* 626 F.2d 32 (7th Cir.1980) (indicating that "advertis[ing] one's business as a debt collection agency" may be sufficient to garner FDCPA coverage). Lason's advertisements are generally aimed at attracting business from all business sectors, an activity that has never been held to create FDCPA liability. Lason does not solicit business only from collection agencies or limit its services to those that would benefit only collection agencies. It provides many of the same promotional materials and services, including the Priority–Gram product, to its non-collection agency customers. While Lason's Priority–Gram may enhance collection agencies' "open and read rates," any company that mails correspondence wants people to open and read its mail; this is not a goal unique to collection agencies. Even if Lason targets collection agencies with specific promotions or services, this does not demonstrate that the "principal purpose" of Lason's activities is the "collection of debt." [6] *See Jenkins,* 25 F.3d at 539.

Similarly flawed is Trull's contention that Lason's advertised intention to form a "strategic partnership" with its customers automatically renders Lason a debt collector. Again, Trull points to nothing indicating that Lason limits this pledge to collection agencies, or that a strategic partnership is something that benefits only collection agencies and not Lason's other customers. Just because Lason uses the term "strategic partnership" to obtain new customers that include collection agencies, it does not follow Lason is collecting debts as defined by the FDCPA. Absent any evidence that this is the case, we cannot rely on this vague promotional statement as a basis for denying summary judgment. *See Jenkins v. Heintz,*

---

ruling. *See Jenkins v. Heintz,* 124 F.3d 824 (7th Cir.1997).

**6.** This is the case with Lason's NCOA (national change of address processing), zip code and phone number updating services, which Lason offers to collection agencies to ensure that their mailing and contact information is as accurate as possible. While these services are marketed to

collection agencies and no doubt ease their business burdens, the NCOA services are not debt collection attempts. Lason does not use the information to contact debtors itself; it merely provides collection agencies with the information to use as they wish. In this respect, we fail to see how the NCOA services involve Lason in the collections process any more that Lason's printing and mailing services.

124 F.3d 824, 831–32 (7th Cir.1997) (viewing the evidence in light most favorable to plaintiff does not require court to resort to conjecture or to speculate on the plaintiff's behalf).

We find that Lason's advertising and service packages do not have debt collection as their principal purpose. Accordingly, Trull cannot rely on this area of Lason's operations to create a triable issue on the debt collector question.

## II. Lason Is Not Sufficiently Involved in the Collections Process to Be a Debt Collector

Next, Trull contends that Lason is operating as a debt collector by playing a significant role in developing its collection agency customers' communications. For support, Trull relies exclusively on the 1996 prospectus filed by Lason's parent company, which states that "the Company" develops the format and wording of many collection letters. This line of argument fails for two reasons: the general wording in the prospectus fails to rebut Lason's specific proof that it did not develop the communications at issue here, and the caselaw holds that printing and mailing services such as Lason are not debt collectors.

Trull presents no evidence that Lason had anything to do with developing the content of the letters to Trull or, even more broadly, Arrow's collection letters. Arrow's Vice–President, Brian Cutler, testified that Arrow drafted its own form letters, then faxed them to Lason for entry into Lason's computer database. After Lason typed in the text, it sent the letters back to Arrow for Arrow's approval. Once Arrow approved the letters, Lason mailed them. It is undisputed that Lason did not write, edit (beyond proofreading) or approve Arrow's communications, or advise Arrow about their content or use. Furthermore, Lason's Priority–Gram is not a product used exclusively by Arrow or other debt collectors, nor is it linked in any way to the substantive content of collection letters. Absent any evidence indicating Lason's involvement in developing the collection letters *in this case,* Trull lacks the specific facts necessary to combat summary judgment. *See Jenkins v. Heintz,* 124 F.3d 824, 831–32

(7th Cir.1997) (on appeal after remand) ("Once the defendants offered evidence ... the burden shifted to Jenkins to move beyond the pleadings and to set forth specific facts from which [the contrary] might be reasonably inferred....").

Second, Trull cannot cite a single case holding that a printing and mailing service is a debt collector under the FDCPA. If anything, the authority is to the contrary. For example, *Powell v. Computer Credit Inc.,* refused to find a printing and mailing service engaged in debt collection when the creditor made significant changes to the printer/mailer's form letter and wielded ultimate authority to approve the letter's contents.975 F.Supp. 1034, 1039–41 (S.D.Ohio 1997). Likewise, Lason merely supplied Arrow the bare-bones Priority–Gram; Arrow then inserted the substantive text and approved the communications before Lason sent them out. Lason is more akin to the collection agency in *Fratto v. Citibank, Jablon, & Capitol Credit Agency,* which was not permitted to take the fall for the brains behind the offending letters—the creditor. 1996 WL 554549, at *6–*7 (N.D.Ill. Sept.25, 1996). Just like the collection agency in *Fratto,* Lason had no input into the collection letters' contents, did not consult with Arrow on the steps Arrow took in the collection process, and was paid a flat rate for its mailing services independent of Arrow's success in collecting debts. In short, Lason did nothing more than print and mail collection letters drafted by Arrow at Arrow's behest. *Fratto* and *Powell* make clear that this is not debt collection.

In contrast to this persuasive judicial authority, Trull relies on an informal staff letter from the FTC's Division of Credit Practices opining that certain (distinguishable) activities of a mailing service qualified as debt collection. *See* Pl. Resp. Ex. D. The mailing service discussed in the FTC letter bears similarities to Lason in that it did not furnish the contents of its creditor-customers' collection letters, did not receive payments from debtors, and did not provide contact information in the letters. The mailing service, however, incorporated a key distinction: it provided a phone service whereby it directly contacted debtors and left a recording, which

the mailing service had developed "in consultation with" the creditor, indicating that the debtor had an outstanding obligation and explaining how to pay it. It is easy to see why this activity constitutes debt collection—it falls under the statute's literal terms. By contacting debtors on its own via telephone—with a message whose contents it helped define—and informing debtors about obligations owed, the mailing service was literally attempting to collect a debt. This situation is distinguishable from Lason's; at no time did Lason follow up on Arrow's collection efforts by calling or otherwise contacting debtors, nor did Lason have a hand in crafting Arrow's communications with debtors.

In sum, we find that Trull has not submitted evidence that would permit a reasonable jury to find that Lason's activities in connection with Arrow's communications rose to the level of debt collection.

### III. Lason's Identification in Trull's Letter Does Not Bring It Under the Act

Finally, Trull argues that Lason's nominal appearance on the February 9 communication renders it a debt collector. She contends that the "unsophisticated consumer" looking at the letter would have thought Lason was a debt collector, and that this is sufficient to trigger FDCPA coverage. For support, Trull relies on the Seventh Circuit's decision in *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir.1996), which viewed collection letters' compliance with the FDCPA through the eyes of the "unsophisticated consumer."

But *Avila* has no application here because it addressed an entirely different legal issue. The court never considered whether the defendant was acting as a debt collector under FDCPA section 1692a(6). Rather, the issue was whether the defendant attorney, who permitted his signature to appear on collection letters without substantively reviewing them, was liable for falsely implying that the communications were from an attorney in violation of FDCPA section 1692e. *Id.* at 228–29. Contrary to the section 1692a(6) analysis, which weighs a defendant's lack of involvement in the collections process in the defendant's favor, the section 1692e inquiry bases liability on the attorney's failure to

participate: he must be "directly and personally involved in the mailing of the letters in order to comply" with that provision. *Id.* at 228. Otherwise, it is misleading for the attorney to sign the letter, creating the impression that "the attorney has reached a considered, professional judgment that the debtor is delinquent and is a candidate for legal action." *Id.* at 229. Consequently, *Avila* provides no guidance in the debt collector inquiry.

Even if the *Avila* decision could be read implicitly to hold that the defendant attorney met the definition of debt collector under section 1692a(6), his activities provide no comparison to Lason's. The attorney in *Avila* received all his business from a collection agency in which he had an 80% ownership interest, devoted his entire practice to collecting debts for this agency, and even filed collection suits on the agency's behalf. *Id.* at 224.

Putting aside the problems with Trull's legal authority, no reasonable juror (or even an unsophisticated consumer) would form the impression that the February 9 letter is from Lason or that Lason is driving the debt collection attempt. The letter clearly identifies Arrow as both a collection agency and the sender: Arrow's address, telephone number, and contact person—Marty Pryor, identified in the January 19 letter as an Arrow employee—are prominently displayed. In contrast, Lason's name is relegated to the upper corner of the letter and is not accompanied by a phone number, address, or contact person. Moreover, neither Arrow's letter preceding nor its letter following the February 9 Priority–Gram makes any reference to Lason, and both letters unequivocally state that they are attempts by Arrow to collect Trull's retail debt. These are precisely the facts that both the *Powell* and *Fratto* courts found compelling in determining that the printer/mailer was not a debt collector. *See Powell*, 975 F.Supp. 1034, 1039–41 (S.D.Ohio 1997) (printing creditor's return address and phone number on the letter and including an instruction to contact creditor was a "clear[ ] indicat[ion]" that the communication was from the creditor); *Fratto*, 1996 WL 554549, *3 (N.D.Ill. Sept.25, 1996) (in-

cluding employee's name and phone number on collection letter was evidence that creditor was engaging in debt collection activity).[7]

While Trull may not have been able to tell from the February 9 letter that Lason is a printing/mailing service, the string of communications she received from Arrow do not leave any room to believe that Lason is trying to collect Trull's debt. Accordingly, she cannot withstand summary judgment on this ground.

## CONCLUSION

For the reasons above, we grant summary judgment in Lason's favor, and deny Trull's motion for class certification as moot. Trull has failed to raise a genuine issue of material fact that would permit a reasonable jury to find that Lason was acting as a debt collector under the FDCPA. The Clerk of the Court is directed to enter judgment in favor of Lason and against Trull pursuant to Fed. R.Civ.P. 58.

---

**7.** After this opinion was finalized, but just before it issued, Lason moved to submit as additional authority Judge Grady's opinion in *Laubach v. Arrow Service Bureau, Inc., Lason Sys. Inc., Alan Slodki, Robert Lavin & Norma Lavin*, No, 97 C 26, —— F.Supp. —— (ND.Ill. Oct. 30, 1997). The *Laubach* case, like Trull's, also attempted to hold Lason liable as a debt collector for its advertising, printing and mailing activities. Judge Grady held, as we did, that these activities did not render Lason a debt collector; as a result, he granted Lason summary judgment. Judge Grady's focus matched ours: he considered significant the facts that Lason does not collect debts; that debtors are never instructed to contact Lason; that Lason does not include its return address or phone number on the collection letters it prints; that Lason does not provide follow-up contact services; that its fees are not contingent on the success of its debt collector-customers' efforts; and that its promotional brochures "are nothing more than advertisement techniques designed to solicit business." *Id.* at 14–16, —— —— . It is comforting to know that Judge Grady has reached the same conclusion on these very facts, and his decision gives further force to our ruling in Lason's favor.