**Brenda RANDLE and Pamala Edwards, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**GC SERVICES L.P., DLS Enterprises, Inc., and GC Financial Corporation, Defendants.**

No. 97 C 8054.

United States District Court, N.D. Illinois, Eastern Division.

May 28, 1999.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Ignacio Daniel Maramba, Edelman & Combs, Chicago, IL, Charley Hoon Lee, Edelman & Combs, Chicago, IL, for plaintiffs.

George William Spellmire, David Matthew Schultz, John Matthew Foley, Hinshaw & Culbertson, Chicago, IL, for defendants. ·

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiffs Brenda Randle and Pamala Edwards have filed a class action[1] suit against defendants GC Services, L.P. ("GC Services"), DLS Enterprises, Inc., and GC Financial Corporation, alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. Defendants move for summary judgment, arguing that: (1) GC Services cannot be liable as a "flat-rater"[2] under § 1692j(a) because it was actually collecting plaintiffs' debts; and (2) because GC Services was collecting plaintiffs' debts, the letter it sent plaintiffs was not misleading or deceptive in violation of § 1692e. Plaintiffs filed a cross motion for summary judgment.

### FACTS

Plaintiffs are residents of Illinois. Defendant GC Services is a Delaware limited

---

**1.** On September 14, 1998, this court issued an opinion certifying the plaintiff class.

**2.** The FDCPA's legislative history defines a flat-rater as "one who sells to creditors a set of dunning letters bearing the letter-head of the flat-rater's collection agency and exhorting the debtor to pay the creditor at once." *See Randle v. GC Services, L.P.,* 25 F.Supp.2d 849, 853 (N.D.Ill.1998) (quoting S.Rep. No. 95–382, at 5, *reprinted in* 1977 U.S.C.C.A.N. 1695, 1699). "[A] debt collector cannot furnish form letters bearing its name to a creditor for a fee ... when it is otherwise not involved in the collection effort." *White v. Goodman,* 41 F.Supp.2d 794, 796 (N.D.Ill. 1998).

partnership and a "debt collector" under the FDCPA. Defendants DLS and GC Financial are Delaware corporations and general partners of GC Services.

Shortly after March 18, 1997, plaintiff Randle received a letter from defendants demanding payment for subscriptions to *Jet* and *Disney Adventures* magazines. Shortly after August 12, 1997, plaintiff Edwards received a substantially identical letter demanding payment for subscriptions to the periodicals *Nickelodeon* and *Animals*. The letters, copies of which were attached to the amended complaint as Exhibits A and B, state: "This is a demand made on behalf of Publishers Clearing House for payment on your delinquent balance.... If you do not pay promptly, Publishers Clearing House has informed us that your file will be referred to us or another collection agency which is properly authorized to undertake collection activity.... It is in your best interest to promptly mail your payment." One portion of the letter is a detachable payment statement that directs the debtor to make payments to PCH's post office box. In addition, if the debtor sends payment in the enclosed envelope that accompanies the collection letter, the payment reaches PCH's post office box.

Plaintiffs assert that the type of document represented by Exhibits A and B is a "precollection" letter which falsely suggests that a third party collection agency, GC Services, has become involved in collecting the debt, while the debt in fact remains with the creditor, Publishers Clearing House ("PCH").

## DISCUSSION

Under Fed.R.Civ.P. 56(c), a court should grant a summary judgment motion if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." *See Kreutzer v. A.O. Smith Corp.*, 951 F.2d 739, 743

(7th Cir.1991). The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(c). When reviewing a summary judgment motion, the court must read the facts in a light most favorable to the non-moving party. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## I. Claimed Violation of FDCPA § 1692j(a)

The central issue in this case is whether GC Services, a debt collection agency, was operating as a "debt collector" under the FDCPA when it sent plaintiffs the above letter.[3] Under § 1692j(a):

It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

Defendants argue that at the time GC Services sends out a letter, PCH has referred the debt to it for collection. Plaintiffs counter that PCH has not retained GC Services to collect the debt at this point, but has merely hired GC Services to send a single dunning letter.

According to Wendy Smith ("Smith"), PCH's Director of Credit and Collections, the collection process is divided into two phases, the initial phase and the contingency phase. During the initial phase, PCH transmits certain information about its

---

**3.** Courts have held that a company's status as a debt collection agency does not necessarily make it a debt collector under the FDCPA. *See*

*Trull v. Lason Systems, Inc.*, 982 F.Supp. 600, 605 (N.D.Ill.1997) (discussing *Jenkins v. Heintz*, 25 F.3d 536, 538–39 (7th Cir.1994)).

debtors to GC Services (the debtor's name and address, the amount of the debt, and the PCH order number), but does not transfer paper files on the debtors. GC Services, with PCH's approval, creates a letter indicating the names and addresses of GC Services and PCH, and mails it to debtors. PCH pays GC Services for each letter mailed. The letter does not have a telephone number for PCH or GC Services, and requests that debtors send payments and direct inquiries to PCH. If a debtor does not respond by a certain time, PCH decides whether to pursue collection and the collection process enters the contingency phase. At this point, PCH assigns to collection agencies other than GC Services eighty percent of the delinquent accounts it has decided to pursue. GC Services therefore pursues collection on the accounts of less than twenty percent of the debtors to whom it sends an initial letter.[4]

The text of the letter itself provides strong support for plaintiffs' argument. The statement in the letter that reads, "If you do not pay promptly, PUBLISHERS CLEARING HOUSE has informed us that your file will be referred to us or another collection agency," suggests that at the time the letter is sent, PCH has not yet referred the debtor's file to GC Services or any other collection agency. *See Roe v. Publishers Clearing House, Inc.,* 39 F.Supp.2d 1099, 1102 (N.D.Ill.1999) (companion case to the instant case); *Maguire*

*v. Citicorp Retail Services, Inc.,* 147 F.3d 232, 237 (2d Cir.1998) (holding that the use of the phrase "will be reported" in a letter "supports an inference that, since the account may be reported to a collection agency, [the ostensible debt collector] Debtor Assistance is not such an agency," though the court noted that the unsophisticated consumer might just as easily draw the opposite inference). The fact that GC Services ultimately attempts to collect from only a fraction of the debtors to whom it sends the initial letter further bolsters plaintiffs' argument. *See Roe,* 39 F.Supp.2d at 1102 (denying defendant PCH's motion to dismiss in the companion case because the text of GC Services's letter and the fact that only 20% of the accounts ended up with GC Services suggested that at the time the initial letter was sent, PCH alone was operating as the debt collector). Yet defendants argue that disputed facts prevent the court from determining whether GC Services operates as a debt collector during the initial phase, as opposed to merely sending a letter.

GC Services asserts that a number of factors demonstrate that it is participating in the debt collection process during the initial phase in such a way that it comes under the FDCPA's definition of "debt collector."[5] One factor that suggests that an entity is a debt collector under the FDCPA is whether the entity "designed" the letter. *Laubach v. Arrow Serv. Bureau, Inc.,* 987 F.Supp. 625, 630–31 (N.D.Ill.1997). According to GC Services,

---

4. Assuming that some debtors who receive an initial letter settle the bill, and that PCH declines to pursue other such debtors, the pool of debtors that enters the contingency phase is smaller than the pool of debtors that receives an initial letter. Twenty percent of the contingency pool is therefore less than twenty percent of the initial pool.

5. GC Services initially argues that plaintiffs improperly consider the initial phase in isolation from the later contingency phase. GC Services claims that the only other case on point in this district is *White,* 41 F.Supp.2d 794, and that Judge Moran in *White* considered both phases together. Several days be-

fore defendants filed their brief, however, this court considered the initial phase in isolation in its opinion in *Roe,* the companion case to the instant case. This court distinguished *White* because nearly all of the accounts in that case remained with the collection agency, NSA, through both phases. *See Roe,* 39 F.Supp.2d at 1102. *See also Peters v. AT & T Corp.,* 43 F.Supp.2d. 926, 927 (N.D.Ill.1999) (focusing almost exclusively on the initial phase, and noting that "AT & T assigns approximately 15% of its Stage II accounts to GC Services randomly, without even considering whether GC Services was involved with the account in Stage I").

it has the authority to revise the collection letter. Plaintiffs present evidence, however, that although both GC Services and PCH may revise the letter, PCH has the authority to review and reject any changes GC Services makes.

GC Services also claims that each of the letters it sends during the initial phase is hand-reviewed by GC Services's personnel. Plaintiffs dispute this claim with evidence that GC Services serves between 50 and 100 corporate clients other than PCH, yet employs a total of three people to manage the initial phase for all of these clients. Whether GC Services's employees hand-review each letter is not a material fact in dispute, however, because courts have held that merely proofreading a letter does not render a defendant a debt collector. *Trull*, 982 F.Supp. at 607.

GC Services argues further that it provides follow-up collection services after sending the letter. *See Laubach*, 987 F.Supp. at 631 (holding that providing follow-up services may render an entity a debt collector). According to GC Services, it receives about 200 letters per month in response to its initial letter, and some of this correspondence includes payments.[6] Yet plaintiffs present evidence that GC Services does not have the authority to respond to any of this correspondence, and is required to forward it to PCH on a weekly basis. Plaintiffs also cite Smith's testimony that once GC Services sends the initial letter, it has fulfilled its duties with respect to the initial collection phase.

GC Services also insists that it monitors the effectiveness of the letters it sends out during the initial phase. Plaintiffs respond that GC Services has no way of doing so, because Smith testified that PCH never informs GC Services whether a customer has paid the debt. GC Services replies by citing the affidavit of Diana Derbas ("Derbas"), manager of both phases of GC Services's collection process, the initial phase and the contingency phase. Derbas makes a vague statement in her affidavit that GC Services tests the letters used in the initial phase in other collection programs, but plaintiffs' evidence demonstrates that PCH is not aware of the results of any such tests.

Finally, GC Services cites Derbas's supplemental affidavit to argue that its representatives have met with PCH's representatives and proposed changes to both phases of the collection program. Plaintiffs note, however, that Smith testified that at such meetings, the representatives of the two companies talk almost exclusively about the contingency phase, and that there is not much discussion about the initial phase.

GC Services analogizes the instant case to *Arellano v. Etan Industries, Inc.*, 1998 WL 911729 (N.D.Ill.Dec.23, 1998), in which this court found facts in dispute and denied the parties' cross motions for summary judgment. The parties in *Arellano*, however, presented conflicting testimony about the degree to which the collection agency, Etan, remained involved with debtors' accounts after it sent the initial

---

**6.** The collection letter includes both GC Services's and PCH's name and address, but does not include a phone number for either. On balance, this evidence does not favor either party. If GC Services's name and address were not in the letter, this would be strong evidence that it was not operating as the debt collector. *See Laubach*, 987 F.Supp. at 631 (holding that the defendant was not operating as the debt collector, and basing this holding in part on the fact that the defendant's name and address were not included in the collection letter). The presence of GC Services's contact information does not necessarily mean that defendant is operating as the debt collector, however, and the presence of PCH's contact information in the letter suggests that PCH, to whom the debtors were directed to send payment, rather than GC Services, was attempting to collect the debt. *See, e.g., Powell v. Computer Credit, Inc.*, 975 F.Supp. 1034, 1040–41 (S.D.Ohio 1997) (holding that a letter that contained the creditor's name, return address, and phone number was a letter from the creditor, even though the letter was printed on a debt collector's stationery); *Trull*, 982 F.Supp. at 608 (same).

letter. Although a representative of the creditor testified that all Etan did was mail letters (which would have amounted to a violation of FDCPA § 1692j(a)), the defendant presented testimony that Etan was authorized to work out partial payment plans with debtors, and to recommend that certain debtors be referred to credit bureaus and/or attorneys. *See id.* at *2. In the instant case, Smith testified that once GC Services sends the initial letter, it has fulfilled its part of the bargain with respect to the initial phase. She also testified that GC Services never works out payment plans with debtors or recommends that certain debtors be reported. Defendants do not present any evidence to contradict Smith's testimony that once GC Services sends the letter, it has fulfilled its end of the contract.

The instant case is quite similar to *Peters*, 43 F.Supp.2d 926, in which the plaintiffs likewise claimed that GC Services had violated § 1692j(a). Judge Bucklo denied cross motions for summary judgment in *Peters* because the evidence was unclear about the type of contact GC Services had with the creditor during the initial phase, and about whether GC Services was authorized to handle questions from debtors. *See id.* at 929. Neither of these factors is in dispute in the instant case. Rather, the evidence demonstrates that representatives of GC Services and the creditor, PCH, rarely discuss the initial phase, and that GC Services must forward all communications from debtors to PCH.

■ The court agrees with plaintiffs that GC Services's involvement in the collection process resembles the involvement of a mailing service, rather than that of a debt collector. GC Services does not collect money from debtors, and debtors are not directed to contact GC Services (though GC Services's name and address are included on the collection letters). Instead, debtors are directed to contact and pay PCH, and any payment placed in the envelope that accompanies the collection letter reaches PCH's post office box.

Moreover, GC Services does not provide followup collection services, and GC Services charges PCH a flat fee, rather than charging according to the amount of money PCH actually collects, *see Epps v. Etan Industries, Inc.,* 1998 WL 851488, at *6 (N.D.Ill.Dec.1, 1998) (holding that the creditor was not collecting its own debts, and basing this holding in part on the fact that the creditor compensated the collection agency that sent the letter for successful collection attempts only, not for each letter mailed). These same factors led Judge Grady to conclude that the defendant in *Laubach* was not a debt collector under the FDCPA, and to grant summary judgment for the plaintiff. *See Laubach,* 987 F.Supp. at 631.

GC Services attempts to analogize the instant case to *White,* 41 F.Supp.2d 794, in which Judge Moran found that the collection agency, NSA, was operating as a debt collector under the FDCPA. Plaintiffs respond that the facts of *White* are distinguishable because the letter in that case provided a phone number for NSA, and the number reached an automated system that provided answers to frequently asked questions and a means for recording a message from the debtor. *See id.* at 796. More importantly, however, NSA had the authority to decide whether to pursue the collections process past the initial phase, and the accounts of nearly all of the debtors to whom NSA sent letters remained with NSA into the contingency phase. *See id.* at 797. This evidence led Judge Moran to conclude that by the time NSA sends the initial letter, NSA has been assigned the accounts for collection, and "the price of poker has indeed gone up." *Id.*

In contrast, the evidence in the instant case suggests that when GC Services sends the initial letter, it is merely masquerading as the debt collector to convey the false impression that "the price of poker has just gone up" in order to "get the debtor's knees knocking." *Avila v. Rubin,* 84 F.3d 222, 229 (7th Cir.1996). The court therefore grants plaintiffs' mo-

tion for summary judgment on the § 1692j(a) claim.

## II. Claimed Violation of FDCPA § 1692(e)

■ Although plaintiffs allege that GC Services violated both § 1692j(a) and § 1692e, this court has previously held that these two sections of the FDCPA are mutually exclusive. *See Arellano,* 1998 WL 911729, at * 1, n. 2 ("A defendant must be a 'debt collector' to violate § 1692e, but must be falsely pretending to be a debt collector to violate § 1692(a). Plaintiff cannot have it both ways.") (internal citations omitted). Because the court has held that GC Services is merely pretending to operate as a debt collector, GC Services is not liable under § 1692e, because that section "impos[es] liability only on 'debt collectors.'" *Laubach,* 987 F.Supp. at 631. The court therefore grants defendants' motion for summary judgment on the § 1692(e) claim.

At the status hearing on June 16, 1999, the parties are directed to address the issues of damages and of notice to the class.